**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **IN RE: FRESENIUS GRANUFLO/NATURALYTE DIALYSATE PRODUCTS LIABILITY LITIGATION** | **MDL NO. 1:13-MD-2428-DPW** |
| **THIS DOCUMENT RELATES TO: ALL CASES** | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF LEADERSHIP'S PETITION FOR AWARD AND ALLOCATION OF**
**COMMON BENEFIT FEES**

The MDL Plaintiffs' Executive Committee and Massachusetts state consolidated plaintiffs' co-lead counsel (hereafter the Plaintiffs' Leadership") present the following information in support of their petition for an Order awarding $15,870,491.01 in common benefit fees, along with an allocation as proposed herein.

More than four years ago, on September 27, 2013, the proposed PEC and PSC appeared before this Court for the initial MDL status conference. The plaintiffs faced a formidable opponent -- Fresenius Medical Care -- a well-funded, well-defended and litigation-savvy defendant. The litigation was intense from the start and will conclude after a long but necessary settlement process that required a 97% opt-in and presented challenges that required substantial effort to the point of consummation on October 12, 2017.

Over the course of four years, the litigation played out in two principal centers of operation. The first was this Multi-District Litigation; the second was the Massachusetts State Court Consolidation in Middlesex County. In addition, a St. Louis contingency of cases added to the mix, as well as a smattering of other lawsuits filed in California and elsewhere.

In February 2016, the litigation resolved in principle, and the settlement process has progressed since then.  The settlement was formally triggered in October 2017 and funded in November 2017.   This Court approved Common Benefit expenses for reimbursement and leadership released those expenses as directed.

Common Benefit Funds collected from each case participating in the settlement, in the amount of $15,870,491.01 (the balance from the application of the 11% assessment to the settlement fund, after the court-allowed reimbursements were made for common benefit expenses), now sit in a trust account awaiting distribution to the firms that made its creation possible.  We ask the Court to award those funds to the Plaintiffs' Leadership in full and allocated in the manner proposed herein.  Leadership requests, however, that the funds not be released until the settlement administrator releases to claimant counsel the settlement funds for payment to the individual claimants.

I.    INTRODUCTION

A.  Brief History of the Facts of the Case

This case involved the hemodialysis process, a medical procedure to remove fluid and waste products from the blood and to correct electrolyte imbalances. Patients need dialysis if their kidneys no longer remove enough wastes and fluid from their blood to keep them healthy. This usually happens when patients have chronic kidney disease with resulting diminished or complete loss of kidney function.

Hemodialysis is accomplished using a machine and a dialyzer, also referred to as an "artificial kidney."  People on dialysis are often gravely ill, and present a broad spectrum of pre-existing conditions.  It is not uncommon for people on hemodialysis to have lengthy medical histories including conditions such as diabetes, hypertension, obesity, and cardiovascular disease.

GranuFlo and NaturaLyte are two substances (actually medical devices) manufactured and marketed by Fresenius Medical Care for use in dialysis treatments for acute and chronic kidney failure.   In June of 2012, the Food and Drug Administrative issued a Class I recall of these products.[1]   The recall was initiated following the release of a memorandum written by Fresenius' Chief Medical Officer, Dr. Raymond Hakim, identifying a significantly increased risk of death to patients undergoing hemodialysis with GranuFlo.   The New York Times followed with a full expose on June 14, 2012.

Litigation ensued shortly thereafter.

**B.  Initial Litigation**

Plaintiffs, mostly surviving family members of deceased dialysis patients, filed lawsuits in Massachusetts state court and in federal district courts across the country, naming some combination of Fresenius defendants.   Lawyers interested in this litigation began meeting in small groups throughout 2012, and in early 2013, a full-scale meeting occurred to discuss coordination of multi-jurisdictional lawsuits, liability theories and general litigation strategy. It became clear early on that a two-front litigation battle would unfold in state and federal courts.

In January 2013, attorneys in Massachusetts filed a Motion for Consolidation of 20 GranuFlo personal injury cases against Fresenius.   Three months later, on March 29, 2013, the Judicial Panel on Multidistrict Litigation entered an order consolidating these matters for pre-trial purposes before the Honorable Douglas P. Woodlock. The team effort to take this litigation on was now fully underway.

---

[1] A situation in which there is a reasonable probability that the use of or exposure to a violative product will cause serious adverse health consequences or death.

And, as typical of many consolidated pharmaceutical and medical device cases, the plaintiffs faced a tough and well-funded adversary in the Fresenius corporate defendants. Fresenius Medical Care North America is the Waltham, Massachusetts based U.S. affiliate of its German parent company, Fresenius Medical Care AG (collectively "FMC"). FMC and its corporate affiliates specialize in the production of medical supplies, primarily to facilitate or aid renal dialysis. FMC is the world's leading provider of products and services for people with chronic kidney failure. In 2016, FMC reported approximately $19 billion in sales.[2] Both FMCNA and Fresenius AG, the German parent company, were named as defendants in the MDL.[3]

The defendant hired several of the nation's leading law firms to defend these claims, including Boston-based Collora LLP (now Hogan Lovells); Fish & Richardson (with attorneys from its Boston, Dallas and San Diego offices participating); and Dowd & Bennett in St. Louis. These firms, with teams of experienced pharmaceutical and medical device litigators, were tremendously skilled and tenacious adversaries.

## II.     THE COMMON BENEFIT WORK PRODUCT

At the outset of many new litigations, it is sometimes difficult to appreciate the level of complexities facing counsel. This case was no exception. As the case proceeded, and full medical records and internal documents came under the microscopic lens of attorneys, experts and consultants, the full breadth of this case's complexity became apparent.

The challenge facing plaintiffs' lawyers was to show that GranuFlo and NaturaLyte, the dialysates used in the dialysis process, were defective such that their chemical composition when

---

[2] https://www.fresenius.com/fresenius-medical-care
[3] Several of the important witnesses in this litigation were employed by the German company, requiring two trips to Europe to conduct these depositions with professional translators, resulting in attendant increases in costs and time.

used in certain patients was a contributing cause in the patient's cardiac arrest.  Plaintiffs were faced with the challenges of dissecting not one but potentially two defective dialysate products, each presenting separate liability and complex causation challenges.  These challenges included complex issues of biochemistry and the effect of the two dialysates on a patient's blood chemistry, and also how the products interacted with the machines and dialyzers used to administer dialysis treatments to patients.

### 1.  Obtaining Proof of Product Identification

Proving both general and specific causation turned out to be a much greater challenge than originally anticipated, not only because of the clients' pre-existing conditions, but also because of the difficulties in obtaining the proof necessary to establish product identification. To make matters even more difficult, not all of the plaintiffs received their GranuFlo at Fresenius facilities; indeed, a significant portion of the patients in this litigation received their treatment at DaVita dialysis centers, smaller private dialysis clinics and hospitals nationwide.  Medical records at some dialysis centers were poor at documenting the dialysate used (performed typically three times a week), and litigants were often forced to track down shipping records and product tracking logs.  Attorneys needed to scour medical records that might indicate chemical formulas that would give clues as to the dialysate used.  Plaintiffs' leadership needed to develop a certain level of cooperation with DaVita -- a non-party to the MDL -- to assist plaintiffs with product identification (a particularly precarious tightrope to walk given the fact that some plaintiffs chose to sue DaVita in other venues for similar personal injury theories of liability).

### 2.  The Science

The leadership in this mass tort was well-versed in the complexities of scientific proof. Both the MDL and State leadership included lawyers with more than 20 to 30-plus years of

experience in piecing together general and specific causation elements with experts in multiple disciplines.  The general consensus of leadership was that few, if any, cases presented a greater challenge of proving both general and specific causation than the instant litigation.  Indeed, in order to marshal the evidence necessary to prove a case and defeat *Daubert* and *Lanigan* challenges, the plaintiffs assembled a team of experts that required the drafting of 17 "general causation/liability" expert reports in the following fields:

- Cardiology
- Nephrology
- Chemistry
- Regulatory Affairs
- Human Factors

o Epidemiology

o Fluid Dynamics

o Biostatistics

o Engineering

o Design Controls

Faced not only with the need to understand and assimilate existing science, plaintiffs were also put in the unenviable position of having to support Fresenius' scientific studies that Fresenius now sought to discredit.  This Court is well familiar with the Raymond Hakim "Memo," a November 4, 2011 internal Fresenius memorandum revealing that GranuFlo posed a six-to eight-fold risk of cardiac arrest.  Dr. Hakim was responsible for the collection and analysis of the data underlying that memo, as well as several other analyses on GranuFlo, bicarbonate and mortality dating back to 2001 and 2002.  Dr. Hakim's internal memo eventually spawned a recall of GranuFlo in June 2012, and multi-year investigation by the Department of Justice that began in December 2012.  The defendant went to great lengths to discredit Dr. Hakim's research findings, even venturing to sponsor outside researchers to conduct countervailing studies to undermine Dr. Hakim's findings.  The deposition of Dr. Hakim was truly a legal event, involving

dozens of lawyers, and spanning four days.  The impact of Fresenius' efforts to debunk its own science, and the efforts plaintiffs undertook to substantiate that science, cannot be overstated.

### 3.   State – Federal Coordination

Managing one mass tort consolidation -- whether in state or federal court -- is challenging enough.   There are abundant travails associated with overseeing, funding, and litigating thousands of cases against a better funded and lawyer resource-abundant defendant in a single consolidation.  When two separate consolidations need to be coordinated while simultaneously maintaining the independence of each, counsel are presented with even more legal maneuvering to manage costs (and egos) and promote efficiencies.  This latter effort was further complicated by the potential for litigation on other fronts, most notably in St. Louis and California, which could have affected the coordinated efforts in the MDL and Massachusetts Superior Court.

The MDL, overseen by The Honorable Douglas P. Woodlock, included approximately 4,600 cases at its peak.   The Court appointed lead counsel, an Executive Committee of six members, and a supportive PSC of 11 additional members.  The Massachusetts consolidation of cases, overseen by The Honorable Maynard Kirpalani, included approximately 7,100 cases at its peak.  The Court appointed three co-lead counsel, and a PSC of six additional members.

Both the MDL and State consolidation were charged with initiating, coordinating and conducting all pretrial discovery; proposing court schedules; calling meetings for coordinating the litigation; selecting and conducting discovery in bellwether cases; conducting *Daubert/Lanigan* proceedings; arguing motions to the Court; exploring settlement options; maintaining the administrative matters of an MDL; and more.

Administratively, the consolidations had to coordinate bank accounts, time and expense record keeping, hire and manage vendors, pay invoices; and keep all plaintiffs' counsel apprised

of the functioning of the litigations. Specifically, pursuant to the State Court Procedural Order

No. 2, Judge Kirpalani directed the State Court leadership

> to coordinate the conduct of this litigation with other product liability
> actions involving Fresenius. To the greatest extent practicable so as not to
> cause delay, the parties shall coordinate with other dialysis litigation
> involving Fresenius; including Federal Court dialysis litigation that is part
> of MDL No. 2428 *In re: Fresenius GranuFlo/NaturaLyte Dialysate
> Litigation* that is pending before the Honorable Douglas P. Woodlock in
> the United States District Court for the District of Massachusetts. Such
> coordination is intended to conserve resources, eliminate duplicative
> document discovery and depositions where possible, serve
> the convenience of the parties and witnesses, and promote the just and
> efficient conduct of this litigation.

In addition, there was a St. Louis contingent of cases that numbered

approximately 861.  MDL and State Court leadership were in constant communication

with St. Louis leadership, who assisted with financing of the overall effort for both

general litigation and expert retention.  Communication and limited coordination with

related litigation in California, Oklahoma and other venues was also necessary.

### 4.  Written Discovery

The job of reviewing the defendant's one million-plus documents -- numbering more than

22 million pages -- was too much for any one or even several firms to handle.  Individual

lawyers from multiple firms were involved in the review.  The litigation's leadership realized

very early that the lawyers could not handle this task alone.  So, the coordinated leadership

established a document depository in Boston and hired attorneys to help in the review effort.

After multiple motions to compel and countless hearings, plaintiffs received the Hakim

study databases and other documents necessary to better understand the nature of the case and

biochemical issues involved in proving general causation from an epidemiologic standpoint.

Plaintiffs invested extensive funds, manpower and time to review, compile and organize all of the information.

Defendant's documents constituted only a portion of the documents reviewed.  Among the most relevant documents were science articles, studies and data – materials that require more than just cursory review.  It was impossible for the PSC to count every medical article its science committee members reviewed because some articles not found relevant were discarded.  Even after culling, there are 1,000-plus scientific articles in plaintiffs' science database. Several lawyers had to master the science of epidemiology and statistics, molecular chemistry, nephrology, cardiology, dialysis and more.  It was no small task.

### 5.  Depositions

In addition to written discovery, hundreds of hours of testimony were taken of corporate representatives of the defendant.  These depositions required days of preparation and typically involved one to two days of questioning.  These depositions were recorded by videotape and transcription, all at great expense.   In this MDL/State coordination, Plaintiffs' Leadership examined and defended witnesses in more than 330 depositions (including Bellwether case-specific discovery).

### 6.  Motion Practice

The battle waged on other fronts, as well.   The defendants filed multiple motions involving such matters as the contents of production of plaintiff fact sheets, limits on case-specific discovery, and the like. The Massachusetts State and MDL courts conducted routine status conferences almost every month.  The agenda for the hearings always included multiple items.   Additionally, *Daubert/Lanigan* motions entailed extensive preparation, briefing and argument concerning very complex medical and scientific principles.

9

### 7.  Ogburn Bellwether Trial

The *Ogburn-Sisneros* case (MICV2013-5050), tried before Judge Kirpalani, was the first bellwether trial in the country. The case concerned Mr. Ogburn's exposure to GranuFlo at a non-Fresenius clinic and his subsequent death, plaintiffs alleged, from cardiac arrest.

Lead counsel was the law firm of Janet, Jenner & Suggs, LLC, with local counsel leadership from the Sugarman Rogers law firm.   In addition, lawyers from several PEC/PSC firms helped prepare for the trial by way of months of focus group presentations, strategy development meetings, trial consultant sessions, and expert witness preparation. Fresenius' rolling disclosures of evidence and resolution of final depositions necessitated constant reworking of the trial strategy and preparation. Pre-trial motions practice carried into the trial with crucial evidentiary decisions occurring throughout the trial.

In the end, plaintiffs presented a compelling liability case. Plaintiffs showed that Fresenius possessed knowledge of potential risks and difficulties using the product safely for many years, but failed to disclose them. Plaintiffs consequently secured a liability verdict – the jury found Fresenius failed to warn. Nonetheless, Fresenius successfully undercut the underlying medical and scientific issues to suggest something other than its product caused Mr. Ogburn's death.  Judgement was entered for the defendant.[4]

### 8.  *Lastorka* and *Dial* Bellwether Trial Preparations

In the MDL, two Bellwether cases were scheduled for trial commencing in January and February 2016 respectively.  These two cases were fully developed in fact and expert discovery, through to trial motion practice.  Shortly before trial, *Lastorka* was continued by agreement. In preparation for *Dial*, the bellwether trial team spent weeks preparing for focus groups, and

---

[4] Plaintiffs noted an appeal, but settlement curtailed the process before oral argument.

afterward, many days of extensive analysis and implementation of resultant strategies. The *Dial* trial team[5] spent months preparing for trial, and the case was ready to commence but for the announcement of the global settlement in principle.

### 9. Settlement

In the summer of 2015, Fresenius and representatives of the Plaintiffs' Leadership (hereafter the Plaintiffs' Negotiating Committee or "PNC") began informal discussions to explore the possibility of a global settlement. Counsel for Fresenius and the PNC met several times during the fall of 2015 to continue these explorations, which helped to focus the primary hurdles to settlement but which also revealed a wide gap in thinking about the potential settlement value of the case. After the verdict in the *Ogburn* case, Fresenius and PNC agreed to more formal mediation with Boston-based Professor Eric D. Green of Resolutions, LLC. Mediation efforts in January and early February led to the settlement in principle for Two Hundred Fifty Million Dollars.

The settlement negotiation and process that followed was challenging for several reasons, including the large number of cases filed and the difficult medico-legal causation issues that required sorting meritorious cases from those that would not meet certain threshold causation criteria. The total settlement amount recognized that many of the cases filed would not likely survive case-specific Daubert challenge and that settlement funds could not be used to pay these cases. Plaintiffs faced the further challenge that, among cases likely to survive, the compensation program had to account for myriad but significant differences, such as the amount of bicarbonate prescribed, pre-dialysis blood bicarbonate and potassium levels, the amount of

---

[5] The *Dial* bellwether trial team differed from the team of lawyers who took the case to trial after it was opted out of the settlement.

time between a patient's last dialysis treatment and cardiopulmonary arrest, and other considerations.

In the end, plaintiffs' leadership, working with court-appointed Special Master Eric Green, constructed a settlement program that met these challenges. The 97% opt-in condition of settlement meant that plaintiffs' leadership had to manage the situation whereby thousands of cases that did not meet threshold causation criteria would need to be dismissed voluntarily or as a result of the subsequent entry of so-called "Lone Pine" orders. The remaining cases would then be compensated different amounts based on scientific principles affecting causation, with the strongest cases receiving the greatest amounts and the weakest receiving the least.

The result, expressed in approximations, is that – of the approximately 12,000 cases filed – some 4,000 were dismissed: approximately 7,500 cases were submitted to the settlement claims administrator, of which approximately 5300 were submitted as Alternative Pay Awards ("APA") for which plaintiffs will be paid $1,500; and of the approximately 2,200 remaining cases, 2,000 are claiming compensation for payment as GranuFlo cases and 200 as NaturaLyte cases.[6]

**10. Other matters**

No single brief under 25 pages could pretend to capture the totality of the work product produced in a four-year litigation. That being said, we would be remiss not to mention a few additional, major elements to the litigation:

> a. <u>Bellwether Program</u>: The State Bellwether program began with 20 Phase I cases, and was ultimately winnowed down to four actively litigated cases, and four on deck for trial. One case, the *Ogburn* case, was actually tried to a verdict (the jury finding the defendant negligent, but the negligence not the

---

[6] The Claims Administrator has authority to determine whether each claim qualifies for compensation and can, in appropriate circumstances, deny claims outright.

cause of the harm).  On the federal side, the MDL Bellwether program began with 20 cases, of which 8 cases were dismissed; the remaining 12 underwent deposition discovery, after which two cases were selected for trial by agreement of the parties.

b. <u>Census Data / Core Medical Records</u>:  The bellwether process requires that the bellwether cases are representative of the issues presented in the litigation.  In order for us to argue what is and what is not representative, leadership endeavored to collect and analyze core census data on thousands of cases.

c. <u>Appointment of Special Master -- Judge Margaret Hinkle – Privilege Log</u>:  Judge Kirpalani appointed Judge Margaret Hinkle as a Special Master to hearing matters attendant to the defendants' privilege log.  The parties banged heads over the privilege log countless times in in-person meetings before Judge Hinkle in order to break through the log-jam.

d. <u>Jury Consultants and Focus Groups</u>:  We had the general liability case, and the bellwether cases, frequently analyzed by focus groups and jury consultants to analyze messaging and exhibits.

e. <u>Leadership Communications, Webinars and Global Meetings</u>: Leadership held multiple webinars and global meetings to keep everyone apprised of the workings of the coordinated litigations, and to teach the science and product identification issues.  In addition, leadership conducted several webinars and in-person global meetings to assist counsel with the settlement process.  Throughout the litigation, Plaintiffs' endeavored to keep all counsel abreast of events, topical matters and issues, and to answer questions.

f. <u>Experts</u>:  The retention and eventual disclosure of expert opinions, particularly on issues of general liability and causation, required extraordinary effort.  This was a prelude to expert depositions, which involved extensive preparation; the drafting of *Daubert/Lanigan* motions and memoranda; and eventually joint MDL/Superior Court arguments.  The plaintiffs' leadership put considerable effort into providing both courts with understandable motion papers and presentations intended to assist the courts in understanding the complex scientific principles presented.

## III.    The Common Benefit Fee Committee's Work

It is now time for those who worked at the forefront of this litigation, and then facilitated settlement for all plaintiffs, to be compensated for their common benefit work.  Proposing a division of funds has been no easy task given the litigation's duration and the limited fund

settlement. Each successive year the PSC outlaid additional costs, and the number of hours expended increased, thereby steadily decreasing the fees available to compensate firms.  No firm will receive an undue windfall, by any means, and the Plaintiffs' Leadership, including its Common Benefit Fee Committee (hereafter "CBFC"), has gone to great lengths to ensure the allocation process has been fair. The co-chairs of the CBFC committee, Robert Jenner (co-lead counsel for the Massachusetts State litigation), James Gotz (the MDL PEC's day-to-day manager of the litigation) and Anthony Tarricone (PEC chair and liaison counsel for the MDL) met literally dozens of times in person, by video conference and telephonically to prepare the necessary documents and proposals for the entire committee to consider.  The entire committee convened several times by telephone conferences. After robust discussion, the CBFC unanimously approved a recommendation for the allocation of common benefit fees it could make to all CBFC firms.

On September 20, 2017, the CBFC leadership emailed the unanimous proposal to the firms that submitted common benefit time for consideration, and gave those firms an opportunity to question or challenge the proposal.  Only three law firms responded with inquiries.  Following discussions, only two law firms asked the CBFC for reconsideration.  The CBFC Co-Chairs considered the requests with the entire committee, which ultimately chose to affirm the original, unanimous submission.

It is worthwhile to point out that, given the number of hours expended and recorded in this litigation, and the relatively small residual of common benefit funds available after costs were deducted, no billing member – partners, associates, or staff – will see his or her common benefit time reimbursed dollar for dollar.  Indeed, doing straight math, every billing person will

receive a fee rate of under $100 an hour -- modest compensation by any measure given the duration and complexity of the work performed.

Finally, this process of common benefit collection of time and expenses, submission review, and making recommendations took many months and many long hours. We sought to reach a consensus and to avoid objection, and to our knowledge, we were successful in doing so. We understand that some firms may not be happy with our suggestions, but these numbers are compromises. We have done the best we can to be fair and reasonable and to listen to and consider the concerns of all involved.

## IV.    ARGUMENT AND AUTHORITY

Pursuant to MDL Case Management Order No. 14 (Revised), the MDL Court established a Common Benefit Fund to compensate plaintiff counsel for their capital contributions, expenses incurred and work performed for the good of all Fresenius cases. The Court should award the total available funds (in the amount of $15,870,491.01), and should allocate the funds in the manner described below.

### A.    The Firms Participating in Common Benefit Work Are Entitled to Allocation of the Common Benefit Funds Collected to Date and Remaining to Be Collected.

Compensating attorneys from a general fund for the work provided on behalf of the entire litigation is well-grounded in policy and precedent.[7] The need to ensure equitable compensation of those working for the good of the litigation creates an exception to the general rule that parties

---

[7] *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("Persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense…. Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.").

are responsible for their own attorney's fees.[8]  Moreover, an MDL court has "inherent authority" to assess common benefit fees for counsel working at the court's behest.[9]   This is true in multidistrict litigation as well as class action lawsuits.[10]

The most appropriate method for awarding fees in a case of this nature is the percentage of recovery method. This ensures that attorneys are compensated for both the services rendered and the risk of non-compensation or inadequate compensation that was present.  The Court ordered initially ordered a 9 percent assessment in this case, that was later revised to an 11 percent assessment (7 percentage points for common benefit fees and 4 percentage points for common benefit expenses).  This assessment is in line with other common benefit fees in MDL litigations of this nature.

---

[8] *Hall v. Cole*, 412 U.S. 1, 5-6 (1973) (an exception to the rule that each party pays her own fees "involves cases in which the plaintiff's successful litigation confers a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.") (citation omitted). A court may therefore "intervene to prevent or minimize an incipient free-rider problem," using "measures reasonably calculated to avoid unjust enrichment of persons who benefit from a lawsuit without shouldering its costs." *In re Nineteen Appeals Arising out of San Juan Plaza Hotel Litig. Fire*, 982 F.2d 603, 606 (1st Cir. 1992) (citations omitted). "To allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense." *Hall*, 412 U.S. at 5-6.

[9] *In re Vioxx Prods, Liab. Litig.*, 802 F. Supp. 2d 740, 770 (E.D. La. 2011) (*citing and quoting in re Air Crash Disaster at Florida Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1019-20 (5th Cir. 1977)).

[10] *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, MDL No. 05-1708 (DWF/AJB), 2008 WL 682174, at *5 (D. Minn. Mar. 7, 2008).  Class actions and MDL proceedings are interchangeable with respect to the procedure for repaying those attorneys who have conferred a benefit on a larger group. Restatement (Third) of Restitution and Unjust Enrichment § 29 (2011) ("Under certain conditions, a person who has incurred expenses or rendered services to preserve or create a "fund" in which others are interested may require the others—in the absence of contract—to contribute ratably to the cost of securing the common benefit… The recovery authorized by § 29 does not depend on whether the underlying litigation—by which a common fund is secured for multiple beneficiaries—takes the procedural form of a class action.").

**B.  Lead Counsel are in the Best Position to Evaluate the Qualitative Contributions of the Work Effort Performed by Common Benefit Attorneys and to Make Recommendations to Court Based on their Insight and Experience.**

There is precedent in Massachusetts District Court for giving lead counsel the responsibility of determining fee allocation in order to reduce the burden on the court. See *In re Volkswagen & Audi Warranty Extension Litig.*, 89 F. Supp. 3d 155, 163 (D. Mass. 2015) ("Usually, the Court is not burdened to address the details of these kinds of arrangements between class and non-class counsel…").  Moreover, delegating the planning of the allocation process saves the Court's time and energy. *Wallace v. Powell*, 301 F.R.D. 144, 168 (M.D. Pa. 2014) (Allocation of fees in this manner is rational because counsel "are most familiar with the work done by each firm and each firm's overall contribution to the litigation," and this process "conserves the time and resources of the courts." *Processed Egg Prods.*, 2012 WL 5467530, at *7 (citation omitted). Co–Lead Counsel will therefore be permitted to distribute the fee award to those attorneys who assisted in creation of the Settlement fund.

Lead counsel is closer to the inner workings of the plaintiff's side of the case, and thus is in a better position to determine which firms have earned a larger percentage of the award. *Fee allocation procedures in class actions*, 5 Newberg on Class Actions § 15:23 (5th ed.) ("it is axiomatic that the court has the ultimate authority to determine how the aggregate fee is to be allocated among counsel;" however, "it is a common practice that a court will, in the first instance, deputize lead counsel or class counsel to propose a fee allocation. A court typically does so because lead counsel is likely more knowledgeable about each lawyer's relative contribution to the class's recovery in the case. Lead counsel is therefore institutionally situated to make a more informed decision about the fee allocation in the first instance.").

It is commonplace for the court to defer to Lead Counsel in determining how to allocate the common benefit fee award. *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, at *3 (E.D. Pa. Jan.3, 2008) ("Courts generally approve joint fee applications which request a single aggregate fee award with allocations to specific firms to be determined by co-lead counsel, who are most familiar with the work done by each firm and each firm's overall contribution to the litigation. In addition, allowing Counsel to allocate fees conserves the time and resources of the courts." (*Citing In re Linerboard*, 2004 U.S. Dist. LEXIS 10532 at *54, 2004 WL 122135.).

Courts are well within their discretion to defer to Lead Counsel when determining how to distribute the fee award. *In re Initial Pub. Offering Sec. Litig.*, No. 21 MC 92 SAS, 2011 WL 2732563, at *1 (S.D.N.Y. July 8, 2011) (Once a class action settlement and aggregate award of attorneys' fees have been approved, district courts have discretion to appoint a committee of plaintiffs' counsel to recommend how to divide the aggregate fee to award "reasonable" attorneys' fees. *citing In re Adelphia Commmc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529, 2008 WL 4128702 (S.D.N.Y. Sept. 3, 2008)).

### C.  Having Authorized the Expenditure of Common Benefit Expenses, The Residual Funds Should Be Awarded as Attorneys' Fees.

This Court entered Revised MDL Order No. 14 (Modified as to Par. 38 and 47 Only) imposing an 11 percent common benefit assessment on the recovery.  This Court further entered its *Order Regarding the Motion of Plaintiffs' Executive Committee for Reimbursement of Common Benefit Expenses* (Doc. 1978) which granted reimbursement of held and shared costs (these costs were itemized per common benefit law firm for the Court).  Following the deductions for these costs, there is $15,870,491.01 allocable to attorneys to compensate them for their common benefit time.

The Court should award and allocate these fees according to the recommended percentages identified in **Exhibit 1**, at column D.  The CBFC is of the view that this represents a fair allocation.  While we do not describe all the details of the making of this sausage, we articulate the process and basis for the allocation, below.

### 1. Guidelines and general issues.

The CBFC guided its review of the common benefit issues on several principles.

First, this Court issued orders structuring the sharing and funding of discovery and pretrial expenses and costs for the common benefit of the litigation, and establishing a process for tracking and seeking reimbursement for expended common benefit time and expenses.   In MDL Order No. 14 (Revised), the Court ordered the PSC to be responsible for funding common discovery and pretrial costs and proposing a reasonable prospective contingent assessment upon recoveries on the claims.  It further set forth standards and procedures that Eligible Participating Counsel shall use to seek fees and/or expense reimbursement.   The Court ordered that any Eligible Participating counsel who seeks reimbursement or compensation for common-benefit time and expenses shall comply with these guidelines and any submission by such counsel shall be in accordance with CMO 14.  Specifically, the Court ordered that "the attorney must have performed common benefit work and incurred common benefit expenses and only the common benefit work and common benefit expense incurred shall be included in the Joint Petition."[11] Filed herewith is the **Affidavit of Phillip Garrett**, the court-appointed accountant, which describes the process followed by common benefit lawyers and their compliance with CMO 14's guidelines.

---

[11] Revised Case Management Order No. 14, pg. 28

Second, we were guided by trying to reach fair results, and not stand on formalities. While these orders could be strictly applied to forfeit time and expenses submitted in an untimely or inaccurate way, lead counsel and the PSC chose not to do so. Accommodations were made to ensure that those firms that had contributed to the common benefit were afforded an opportunity to receive an award and be compensated on fees, rather than stand on formal compliance.

Finally, we are guided by the important principle that lawyers ought to avoid asking courts to resolve disputes about fees. A corollary to this is that leaders need to be "less fair" to themselves than to those they lead, particularly when making decisions about common benefit matters.  We believe that was done here.


2.      **Substantive observations and issues**

The CBFC made no attempt to stratify hourly rates in this litigation.  No dollar amounts were assigned to any litigating class of lawyer or staff member.  Simply, there are not sufficient dollars to engage in that process, and to do so would unfairly benefit some, and unfairly penalize others.  Rather, the CBFC took a more holistic approach to the analysis, viewing the relative value of the work produced to bring the matter to a conclusion.  The fact that there is <u>unanimity</u> among the CBFC, and requests for reconsideration raised by only two firms, is a testament to the equitable nature of the process and the result.

Attorney fee allocation is an "unenviable task" for anyone, particularly in complex litigation. [12] Commentators have described the fee allocation decision of the court as a "laborious and necessarily imprecise" endeavor. [13] Ideally, the task is left to the attorneys who are in a better position to evaluate the relative contributions of each. [14] That is especially true of long-term litigation like this. As one court wrote about one particular litigation:

> In the context of this litigation, which has extended over an eight-year period, it is virtually impossible for the Court to determine as accurately as can the attorneys themselves the internal distribution of work, responsibility and risk. [15]

The bottom line is that "counsel were there, working side by side, communicating frequently, and can better assess the relative worth of co-counsels' contributions." [16]   In exercising its discretion, the Court should give substantial deference to the fee committee's determination. [17]

---

[12]   The so-called "common benefit fund doctrine" refers to the establishment of a fund payable to attorneys who benefit others in a litigation, and is not limited to class actions, but includes litigations for which attorneys perform work for the benefit of a larger group. *See Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 86 (2d Cir. 2010) ("It is well established that the common fund doctrine permits attorneys whose work created a common fund for the benefit of a group of plaintiffs to receive reasonable attorneys' fees from the fund.") *citing In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 128–29 (2d Cir. 2010) (per curiam); *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).

[13]   Alba Conte, *Other methods to simplify the burdens to counsel and the court in fee determinations—Means for allocation off overall fee among multiple counsel*, Attorney Fee Awards § 2.17 (May 2013) (attached as Ex. 3) at 1.

[14]   *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 357 (N.D. Ga. 1993) (citation omitted); *accord Longden v. Sunderman*, 979 F.2d 1095, 1101 (5th Cir. 1992); *see also In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 216, 223 (2d Cir. 1987) (counsel are better able to decide weight and merit of colleagues' contributions); *accord In re Linerboard Antitrust Litig.*, 333 F. Supp. 2d 343, 351 (E.D. Pa. 2004); *In re Indigo Sec. Litig.*, 995 F. Supp. 233, 234 (D. Mass. 1998); *DelNoce v. Delvar Corp.*, 457 F. Supp. 1051, 1055 (S.D.N.Y. 1978).

[15]   *In re Ampicillin Antitrust Litig.*, 81 F.R.D. 395, 400 (D.D.C. 1978).

[16]   *In re Copley*, 50 F. Supp. 2d at 1148.

[17]   *In re Copley*, 50 F. Supp. 2d at 1149; *In re Indigo Sec. Litig.*, 995 F. Supp. 233, 234 (D. Mass. 1998). In cases in which no fee committee has been established, deference is given to lead counsel's allocation. In this litigation, however, the Court created the CBFC to make such allocations.

Furthermore, courts have recognized that fees should not be allocated by an unyielding mathematical formula. Even a formula that incorporates multipliers based on a billing party's status (e.g., attorney, associate, paralegal, law clerk) – which was <u>not</u> done in the instant litigation -- cannot capture the differences in skills and contributions of the various individuals.

> In making an award of counsel fees to the Common Benefit Attorneys and in apportioning any fee award among those attorneys, appropriate consideration will be given to the experience, talent, and contribution made by each Common Benefit Attorney who seeks to recover counsel fees.[18]

Nor can a formulaic approach account for the difference in complexity of the tasks involved. Yet, courts have consistently found that the nature of the tasks should bear on the firm's award. As Judge Eldon Fallon wrote in explaining his allocation of fees in the *Vioxx* and *Mobil Oil* litigations:

> In a case of this kind, not all types of work are created equal. Hours spent taking depositions, participating in hearings, actively participating in developing the appropriate litigation strategies and tactics (through moot court presentations or similar practices), drafting briefs, actively participating in Court conferences, arguing motions, negotiating with opposing counsel to reach a settlement, and actively managing and organizing the administrative aspects of the case are some of the more significant types of work that a case of this sort requires and deserves the most recognition. This, of course, is not the only type of work that such a case requires. Documents must be reviewed, categorized, and analyzed, e-mails must be read and responded to; claimants must be kept advised; meetings must be attended and in general the litigation must be monitored.  This work, while necessary and often time-consuming does not deserve equal treatment when allocating fees.[19]

The personnel most valuable to the litigation will undoubtedly be seen to receive a greater comparative value.

As Judge Fallon wrote:

---

[18] *In re Diet Drugs (Phentermine/Enflaming/Dexfenfluramine) Products Liab. Litig.*, No. 1203, 1999 WL 124414, at *3 (E.D. Pa. Feb. 10, 1999) (emphasis added).

[19] *In re Vioxx*, 802 F. Supp. 2d at 772 (*quoting Turner v. Murphy Oil USA, Inc.*, 582 F. Supp. 2d 797, 810-11 (E.D. La. 2008).

[T]here is some criticism expressed that the allocation of common benefit fees contains an element of subjectivity. It is this Courts view that **some subjectivity is unavoidable in allotting common benefit fees.** In the fictional and perfect "best of all possible worlds" of Voltaire's *Candide*, an appropriate allocation might be achieved by applying purely objective criteria such as the billing-rate-times-hours method described above. But in the real and imperfect world of litigation it is an accepted fact that not all work hours are entitled to the same compensation rate. The nature of the work, the skill and experience of the party doing the work, and the result achieved all factor into the appropriate allocation. How these factors are weighed injects an unavoidable amount of subjectivity in the analysis. **The best that can be done to assure the validity of the analysis is to base the subjectivity quotient on sufficient facts and experience, and to invite input from those affected.**

*In re Vioxx*, 802 F. Supp. 2d at 772-73 (emphasis added).  The CFBC employed precisely that methodology here.

## CONCLUSION

For the foregoing reasons, the CBFC respectfully requests that the Court allow the Plaintiffs' Leadership's petition and:

1. Award the available funds ($15,870,491.01) as common benefit fee;

2. Adopt the allocation of fee percentages for the common benefit law firms as recommended in **Exhibit 1** at column D; and

3. Permit disbursement of these funds at the time that settling claimants are issued their awards.

Dated:   December 12, 2017

Respectfully submitted,

/s/ Anthony Tarricone
Anthony Tarricone, Esq.
MDL Plaintiffs' Liaison Counsel
Kreindler & Kreindler LLP
855 Boylston Street
Boston, MA 02116
(617) 424-9100

23

atarricone@kreindler.com

/s/ Robert K Jenner
Robert K. Jenner, Esq. (BBO No. 569381)
MA State Consolidated Litigation Co-Lead Counsel
Janet, Jenner & Suggs, LLC
31 Saint James Avenue
Suite 365
Boston, MA 02116
(410) 653-3200
rjenner@JJSjustice.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this 12th of December, 2017, a copy of the foregoing has been duly served via ECF, with courtesy copies also served upon all known plaintiff counsel with settlement opt in cases via electronic mail this day, and a courtesy copy sent to:

Maria Durant
Collora LLP
100 High Street
Boston, MA 02110-2321
mdurant@collorallp.com
(Lead Counsel for Fresenius Medical Care North America)

/s/ Anthony Tarricone
Anthony Tarricone, Esq.