# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

MDL No. 1:13-mc-02428-DPW

*IN RE: FRESENIUS*
*GRANUFLO/NATURALYTE DIALYSATE*
*PRODUCTS LIABILITY LITIGATION*,

<u>This Document Relates to:</u>

MSP RECOVERY CLAIMS, SERIES LLC, a Delaware series limited liability company, MSPA CLAIMS 1, LLC, a Florida limited liability company, and SERIES PMPI, a designated series of MAO-MSO RECOVERY II LLC, a Delaware series limited liability company,

      Plaintiffs,

v.

FRESENIUS MEDICAL CARE HOLDINGS, INC., d/b/a Fresenius Medical Care North America, a New York for-profit corporation, FRESENIUS USA, INC., a Massachusetts for-profit corporation, FRESENIUS USA MANUFACTURING, INC., a Delaware for-profit corporation, FRESENIUS USA MARKETING, INC., a Delaware for-profit corporation and FRESENIUS USA SALES, INC., a Massachusetts for-profit corporation,

      Defendants.

_____/

## SECOND AMENDED COMPLAINT
### *(Amended as of March 11, 2019)*[1]

---

[1] Plaintiffs file this amendment, pursuant to the Court's February 7, 2019 order.

Plaintiffs, MSP RECOVERY CLAIMS, SERIES LLC ("MSPRC"), MSPA CLAIMS 1, LLC ("MSPA"), and Series PMPI, a designated series of MAO-MSO RECOVERY II, LLC, SERIES PMPI ("MAO-MSO") (collectively, "MSP Recovery" or "Plaintiffs"), file their Second Amended Complaint against Defendants, Fresenius Medical Care Holdings, Inc., d/b/a Fresenius Medical Care North America ("FMCNA"), Fresenius USA, Inc. ("FUSA"), Fresenius USA Manufacturing, Inc. ("Fresenius Manufacturing"), Fresenius USA Marketing, Inc. ("Fresenius Marketing"), and Fresenius USA Sales, Inc. ("Fresenius Sales") (collectively, "Fresenius" or "Defendants"), regarding their NaturaLyte Liquid and GranuFlo Acid Concentrates products.

Plaintiffs' allegations, proof, and statistical data presented in this complaint are based on their own experiences and personal knowledge, their research, the research of their counsel, publicly available articles, studies, reports, and other sources.  In support thereof, Plaintiffs state:

## I.      NATURE OF THE ACTION

1.      Physicians, patients, and health insurers have a right to expect that the medical devices they rely on are safe and perform effectively. As a foundation of that trust, device manufacturers must comply with current Good Manufacturing Practices ("cGMP"). *See* 21 C.F.R. pt. 820.1(a). Devices that fail to comply with cGMP are rendered adulterated and subject to regulatory action. *Id.* at 820.1(c).

2.      Medicare Payers, first-tier, downstream, and related entities, as well as Medicaid payers such as Accountable Care Organizations and other payers (the assigning entities are collectively referred to as the "Assignors") assigned to Plaintiffs the right to recover payments that they made, for which they are entitled to recovery or reimbursement.

3.      As the ultimate party responsible for the health care costs of their Enrollees, the Assignors suffered financial injury when they paid for, or otherwise provided medical care, to their

Enrollees for injuries sustained as a result of having been administered the defective GranuFlo products during hemodialysis.

4.     The Assignors pay for medical care or provide care directly to their Enrollees, or they have to reimburse direct payers because they ultimately bear the full financial loss and impact of all amounts that are paid as a result of Defendant's conduct delineated herein.

5.     Pursuant to 42 C.F.R. § 411.26, Plaintiffs stand in the shoes of the Enrollees, wherein they can collect the payments that were made by the Assignors, such as those arising from injuries resulting from Defendants' defective GranuFlo product.

6.     Fresenius designs, tests, manufactures, labels, advertises, markets, promotes, sells and distributes, products known as GranuFlo Acid Concentrates ("GranuFlo Acid") and NaturaLyte Liquid ("NaturaLyte"), both of which are subject to the cGMPs. *See* Exhibit A, *FDA Approval of 510(k) application no. K030497.*

7.     Dialysis is a process which removes waste from the bloodstream when a patient's kidneys can longer perform the function.

8.     GranuFlo Acid and NaturaLyte are products used in dialysis to achieve a proper balance of acidity and alkalinity in a dialysis patient's blood.

9.     GranuFlo Acid is a dry acid powder, and NaturaLyte is a liquid. Throughout this complaint, Plaintiffs refer to GranuFlo Acid and NaturaLyte, collectively as "GranuFlo."

10.     GranuFlo was defective and unreasonably dangerous because Fresenius failed to properly design the product, label the product, and/or adequately warn of its associated risks. As a result, Fresenius exposed Enrollees to these dangerous products during dialysis, causing significant health problems including, but not limited to, arrhythmia related injuries, and cardiopulmonary arrest.

11.     Fresenius concealed its knowledge of the dangers associated with GranuFlo from patients, health care providers, and the medical community alike. Specifically, at all relevant times in this lawsuit, Fresenius knew or should have known of the risk of serious injury associated with the use of GranuFlo, but failed to adequately disclose said risks to patients, health care providers, and the medical community, including dialysis providers and dialysis patients, such as Enrollees.

12.     The Assignors made payments on behalf of, or otherwise became financially responsible for, Enrollees' medical expenses incurred as a result of Defendants' defective GranuFlo product.

13.     This is a lawsuit to recover damages for injuries sustained by the Assignors, as the direct and proximate result of Defendants' wrongful conduct, as they paid for Enrollees' medical expenses and/or services.

14.     This action arises from the administration of GranuFlo in the dialysis treatment of Enrollees, the resultant injuries suffered by Enrollees caused by GranuFlo, and the medical expenses and economic losses incurred by the Assignors as a result of the defective nature of GranuFlo.

15.     This is not the first time that Fresenius has been sued as a result of the defective nature of GranuFlo, including a failure to properly label, and a failure to adequately warn patients, health care providers, the medical community, Enrollees, and Assignors about the negative effects of GranuFlo.

16.     Starting in 2012, Fresenius faced litigation in federal court, including through multi-district litigation, and in numerous state court actions arising from the manufacturing, marketing, sale, and use of the GranuFlo product. Certain pending cases were transferred and consolidated in a multi-district litigation proceeding in the United States District Court for the

4

District of Massachusetts, *In Re: Fresenius GranuFlo/Naturalyte Dialysate Products Liability Litigation*, Case No. 13-MD-02428-DPW. Although this action originated in Eleventh Judicial Circuit in and for Miami-Dade County, Florida, it was transferred to the multi-district litigation proceedings.

17.     As a result of these lawsuits, Fresenius has entered into numerous settlement agreements.

18.     During 2018, Plaintiffs, as well as MSP Recovery Services, LLC and MSP Recovery, LLC, along with MSP Recovery Law Firm, the Plaintiffs' Settlement Committee ("PSC"), and Providio Lien Counsel, LLC, as the Lien Resolution Administrator and Qualified Settlement Fund Administrator under the Master Settlement Agreement ("Providio") entered into a Private Lien Resolution Program Agreement ("PLRP"). At the time of the agreement, the exact names of those individuals that were part of the settlement with Defendants were unknown to Plaintiffs. Eventually, through the PLRP process and once the exact names were disclosed to Plaintiffs, Plaintiffs were able to determine that it had claims against these defendants that did not fall within the terms of the PLRP.

19.     The PLRP pertained only to GranuFlo cases that qualified for compensation. As a result, Plaintiffs filed the instant action against Defendants, which was originally filed as a Pure Bill of Discovery, and is now being amended herein.

20.     As such, the claims in this lawsuit *do not* consist of the claims that were settled in the PLRP, since the claims that did fall within the PLRP have been separately settled and otherwise resolved.

21.     Defendants' action caused third-party payers, including the Plaintiffs' Assignors to pay for the medical expenses and/or services resulting from the injuries Enrollees' suffered

throughout the United States, including in Massachusetts and Florida.

22.     Therefore, this action seeks damages, together with interest, cost of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## II.     JURISDICTION AND VENUE

23.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a), as there is complete diversity among Plaintiffs and Defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

24.     Fresenius has significant contacts with this federal judicial district, such that they are subject to the personal jurisdiction of this Court, and at all relevant times hereto, Defendants developed, manufactured, promoted, marketed, distributed, tested, warranted, and sold GranuFlo in interstate commerce.

25.     A substantial part of the events and omissions giving rise to MSP Recovery's causes of action occurred in this federal judicial district.

26.     Pursuant to 28 U.S.C. § 1391(a), venue is proper in this district.

## III.     THE PARTIES

### A.     The Plaintiffs

27.     Plaintiff, MSPRC, is a Delaware series limited liability company with its principal place of business located at: 2701 S. Le Jeune Road, 10th Floor, Coral Gables, Florida 33134. MSPRC's limited liability company agreement provides for the establishment of one or more designated Series. All records of all Series are maintained together with all assets of MSPRC.

28.     Plaintiff, MSPRC, has established various designated series pursuant to Delaware law in order to maintain various claims recovery assignments separate from other company assets, and to account for and associate certain assets with certain particular series. All designated series

form a part of MSPRC. Pursuant to MSPRC's limited liability agreement and applicable amendment(s), each designated series will be owned and controlled by MSPRC. MSPRC may receive assignments in the name of MSPRC and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, MSPRC will maintain the right to sue on behalf of each series and pursue any and all rights, benefits, and causes of action arising from assignments to a series.  Any claim or suit may be brought by MSPRC in its own name, or it may elect to bring suit in the name of its designated series.

29.    Certain series of MSPRC have executed irrevocable assignments of any and all rights to recover payments made on behalf of their assignors' health plan members and enrollees. These assignments authorize the series and, in turn, MSPRC, to pursue and enforce all legal rights of recovery and reimbursement for health care services and Medicare benefits.[2]

30.    Plaintiff's, MSPRC, limited liability agreement provides that any rights and benefits arising from assignments to its series shall belong to MSPRC.

31.    Plaintiff, MSPA, is a limited liability company that is duly organized, validly existing, and in good standing under the laws of Florida, with its principal place of business in Miami-Dade County, Florida.

32.    Plaintiff, MAO-MSO, is a Delaware entity, with its principal place of business located at: 45 Legion Drive, Cresskill, New Jersey 07626. MAO-MSO is a citizen of the State of Delaware.

**B.**     **The Defendants**

33.    At all times relevant hereto, FMCNA is and was a corporation organized pursuant to the laws of New York, with its headquarters and principal place of business located at: 920

---

[2] The assignments incorporated in the Appendix herein depict such authorization.

Winter Street, Waltham, Massachusetts. At all relevant times herein, FMCNA was in the business of promoting, manufacturing, labeling, and distributing GranuFlo.

34.    At all times relevant hereto, FUSA is and was a corporation organized pursuant to the laws of Massachusetts, with its headquarters and principal place of business located at: 920 Winter Street, Waltham, Massachusetts. At all relevant times herein, FUSA was in the business of promoting, manufacturing, labeling, and distributing GranuFlo.

35.    At all times relevant hereto, Fresenius Manufacturing is and was a corporation organized pursuant to the laws of Delaware, with its principal place of business located at: 920 Winter Street, Waltham, Massachusetts. At all relevant times herein, Fresenius Manufacturing was in the business of promoting, manufacturing, labeling, and distributing GranuFlo.

36.    At all times relevant hereto, Fresenius Marketing is and was a corporation organized pursuant to the laws of Delaware with its headquarters and principal place of business located at: 920 Winter Street, Waltham, Massachusetts. Its registered agent for service of process within the Commonwealth is: CT Corporation System, 306 W Main St, Suite 512, Frankfort, KY 40601. Upon information and belief, Fresenius Marketing is and was a wholly owned subsidiary of FMCNA.  At all relevant times herein, Fresenius Marketing was in the business of promoting, manufacturing, labeling, and distributing GranuFlo.

37.    At all times relevant hereto, Fresenius Sales is and was a corporation organized pursuant to the laws of Massachusetts with its principal place of business located at: 920 Winter Street, Waltham, Massachusetts. Upon information and belief, Fresenius Sales is and was a wholly owned subsidiary of FMCNA.  At all relevant times herein, Fresenius Sales, Inc. was in the business of promoting, manufacturing, labeling, and distributing GranuFlo.

38.    FMCNA is a vertically integrated company that, through its wholly owned

corporate subsidiaries and associated limited liability companies and clinics, including but limited to FUSA, Fresenius Manufacturing, Fresenius Marketing and Fresenius Sales, is the largest provider of kidney dialysis and renal care products, treatments, and services in the country.

39.     The Fresenius products division sells dialysis equipment and products, including GranuFlo not only to its own clinics' division, but also sells them to many of its leading non-Fresenius competitors, including DaVita, DCI, Renal Ventures, and many others.

40.     As per Fresenius' 2017 Annual Report, Fresenius' Corporate Strategy is depicted as:[3]



41.     Fresenius designs, tests, manufactures, labels, advertises, markets, promotes, sells, and distributes various dialysis equipment, including dialysis machines and disposables, dialyzers, bloodlines, acid dialysate concentrates, and other products used in the dialysis process, including GranuFlo.

42.     Fresenius provides dialysis treatment and services to nearly 200,000 people with kidney disease at more than 2,200 dialysis centers nationwide. Moreover, as of 2016, Fresenius had over 3,752 clinics worldwide. According to its most recent annual report, Fresenius's most important customers are state-owned or public health insurers, private health insurers, and

---

[3] *See* Creating Added Value: Annual Report 2017 (March 11, 2019), https://www.freseniusmedicalcare.com/fileadmin/data/com/pdf/investors/News___Publications/Annual_Reports/2017/FME_Annual_Report_2017.pdf.

companies, and approximately 34% of the Company's nearly €18 billion in consolidated 2017 revenue was attributable to U.S. federal health care benefit programs, such as Medicare and Medicaid.[4]

43.     All conditions precedent to this action have occurred, been performed, or have been waived.

## IV.     STANDING:
## THE REPRESENTATIVE ASSIGNMENT AGREEMENTS

44.     Plaintiffs have been assigned all legal rights of recovery and reimbursement for health care services and Medicare benefits provided by Assignors that administer Medicare benefits for Medicare beneficiaries under Medicare Part C and/or Medicare Part D; whether said rights arise from (i) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements, and/or (ii) state and federal laws that provide for the reimbursement of payments made by the assignor health plans, including the right to recover claims for health care services on a fee-for-service basis.

45.     The Assignors have assigned all rights, title, and interest to the recoverable claims, conferring standing to MSP Recovery to bring this lawsuit. These are all valid and binding contracts.

46.     Plaintiffs' Assignors provided payment for the medical items and services related to the GranuFlo that was prescribed and administered to their Enrollees in Florida, and across the United States.[5]

---

[4] *See id.*

[5] Attached as Exhibit 1 to this complaint, are the instances wherein Plaintiffs' Assignors made payment.

**Plaintiff MSPRC's Standing:**

47.     Certain series of MSPRC have executed irrevocable assignments of any and all rights to recover payments made on behalf of their Assignors' health plan members and enrollees. These assignments authorize the series and, in turn MSPRC through its operating agreement, to pursue and enforce all legal rights of recovery and reimbursement for health care services and Medicare benefits.

48.     The assignments to Plaintiffs, which are alleged in detail in the Appendix to this complaint, are valid and binding contracts.

**Plaintiff MSPA's Standing:**

49.     MSPA has executed irrevocable assignments of any and all rights to recover payments made on behalf of its Assignors' health plan members and enrollees. These assignments authorize MSPA to pursue and enforce all legal rights of recovery and reimbursement for health care services and Medicare benefits.

50.     The assignments to Plaintiffs, which are alleged in detail in the Appendix to this Complaint, are valid and binding contracts.

**Plaintiff MAO-MSO's Standing:**

51.     MAO-MSO has executed irrevocable assignments of any and all rights to recover payments made on behalf of its Assignors' health plan members and enrollees. These assignments authorize MAO-MSO to pursue and enforce all legal rights of recovery and reimbursement for health care services and Medicare benefits.

52.     The assignments to Plaintiffs, which are alleged in detail in the Appendix to this Complaint, are valid and binding contracts.

## V.    GENERAL ALLEGATIONS

### A.    Hemodialysis

53.    The kidneys regulate the balance of electrolytes in the blood, and filter the blood by removing water-soluble wastes, which are diverted to the bladder and excreted as urine.

54.    Chronic kidney disease and acute kidney disease can cause the kidneys to lose their ability to remove waste and extra fluid from the body.

55.    End stage renal disease ("ESRD") is a complete loss of kidney function, as a result of chronic kidney disease and acute kidney disease. People with ESRD require regular dialysis for survival. More than 650,000 patients per year in the United States, and an estimated 2 million patients worldwide are affected by ESRD.

56.    Dialysis is a treatment for patients suffering from late-stage kidney failure. Approximately 90% of dialysis patients receive hemodialysis, a process where the blood is slowly pumped from the body into an external dialysis machine where waste products are filtered out. Waste products accumulate rapidly in the blood and, as such, a hemodialysis patient may need treatment three times a week, for an average of four hours per treatment. Hereinafter, the hemodialysis treatment will be referred to as "dialysis."

57.    The dialysis machine contains an artificial kidney dialyzer that has two compartments separated by a thin semi-permeable membrane. One compartment contains the patient's blood, and the other contains a solution called dialysate or a "bath."

58.    Dialysate consists of water and chemicals (electrolytes) used to remove excess fluids and waste from the blood.

59.     Smaller waste products in the blood, such as urea, creatinine, potassium, and extra fluid pass through the membrane and are washed away by the fluid in the dialysate compartment. The dialysate solution that contains the toxic substances removed from the blood is discarded.

60.     The filtered blood consists of blood cells, proteins, and other important components that are too big to pass through the membrane; the filtered blood is pumped back into the body.

61.     A dialysate delivery system monitors and controls the temperature, conductivity, flow rate, and pressure of the dialysate solution that circulates through the dialysate compartment of the dialyzer. The dialysate delivery system includes dialysate concentrate for hemodialysis, either in liquid form, like NaturaLyte, or in dry powder form, like GranuFlo.

62.     The dialysis process is graphically depicted in the following diagram:



63.     Most dialyzers use a "three stream method," wherein the dialysate is made by mixing purified water in appropriate proportions with a bicarbonate concentrate base and an acid concentrate. This solution delivers necessary minerals to the body and removes waste products that would, otherwise, be removed by healthy kidneys.

64.     The bicarbonate base portion of the dialysate solution is alkaline, which serves to neutralize or buffer some of the excess acid in the patient's blood; thereby, preventing metabolic

acidosis, a potentially life-threatening condition occurring when the body produces excess acid or when the kidneys fail to adequately remove acid from the body. To prevent this dangerous condition, physicians prescribe a specific amount of bicarbonate. The amount prescribed is based upon each individual patient's blood serum level, to be delivered during hemodialysis.

65.    An acid concentrate, such as acetic acid, citric acid, or sodium diacetate, maintains the proper pH of the dialysate and helps keep the minerals in the solution. When the bicarbonate base and the acid solution are combined to form the dialysate, a chemical reaction takes place wherein the organic acid consumes an amount of bicarbonate in the final dialysate equivalent to the amount of acid. This loss of bicarbonate is balanced by an equal gain in acetate, which the liver rapidly metabolizes into bicarbonate.

66.    As a result, dialysis patients receive bicarbonate from two sources: directly from the bicarbonate concentrate used in the dialysate, and indirectly through metabolization. Collectively, the bicarbonate delivered to the patient through the bicarbonate concentrate and metabolization is known as the "total buffer." These elements must be carefully balanced because both low pH levels ("acidosis") and high pH levels ("alkalosis") are abnormal, potentially life-threatening conditions.

**B.    GranuFlo**

67.    GranuFlo is a dry acid concentrate powder designed to be mixed with purified water. Shipping dry acid powder instead of liquid lowers shipping and storage costs associated with traditional 55-gallon drums used to transport and store liquids.

68.    GranuFlo is a dialysate product used to remove impurities in the blood during the dialysis process.

69.     GranuFlo is not regulated by the Food and Drug Administration ("FDA") as a "drug."

70.     There is no National Drug Code, HCPCS J-Code, or other code that has been assigned to GranuFlo.

71.     GranuFlo is approved and regulated by the FDA as Class III medical "device."

72.     The Medical Device Amendments of 1976 to the Federal Food, Drug, and Cosmetic Act ("the MDA") established three regulatory classes for medical devices. The three classes are based on the degree of control necessary to assure that the various types of devices are safe and effective. The most stringently regulated devices are in Class III.

73.     A device is a Class III device if: (1) it is one that is life-supporting or life-sustaining[6]; (2) its use is of substantial importance in preventing impairment of human health, or (3) the device presents a potential unreasonable risk of illness or injury. *See* 21 C.F.R. § 860.3(c)(3).

74.     Because of the potential unreasonable risk of illness or injury, under Section 515 of the MDA, all manufacturers wishing to market a Class III device must submit a Premarket Approval Application ("PMA"), which initiates a stringent pre-market scientific certification process to ensure the safety and effectiveness of a Class III device. This process is similar to the process employed by the FDA to approve new drugs.

75.     However, Section 510(k) of the MDA establishes a streamlined procedure that permits the device manufacturer to make a premarket submission to FDA demonstrating that the device to be marketed is safe and effective because it is substantially equivalent to a previously-

---

[6] A life-supporting or life-sustaining device is essential to or yields information that is essential to the restoration or continuation of a bodily function important to the continuation of human life. *See* 21 C.F.R. § 860.3(e).

approved Class III device already on the market. If the FDA determines that the new device is substantially equivalent to the predicate device, it will issue a letter to the manufacturer assigning it a 510(k) number and authorizing the manufacturer to immediately market the device.

76.     On February 14, 2003, using the Section 510(k) process, Fresenius provided the FDA with notice that it intended to market GranuFlo as the substantial equivalent of a Fresenius dialysate predicate device. *See* Exhibit A, *FDA Approval of 510(k) application no. K030497*.

77.     On May 20, 2003, the FDA cleared GranuFlo for marketing. By utilizing the Section 510(k) process, Fresenius avoided the FDA's rigorous pre-market scientific certification process to ensure the safety and effectiveness of GranuFlo that new device manufacturers ordinarily would have been forced to undergo.

78.     After being cleared by the FDA, Fresenius immediately began to aggressively market the new concentrated dialysate under the name GranuFlo, intended to be used in three-stream hemodialysis machines calibrated for acid and bicarbonate concentrates.

79.     In marketing and advertising claims for GranuFlo, Fresenius claimed and represented that it was a "safe" product. For instance, it indicated:

  a.  GranuFlo was the most-widely prescribed dry acid product in the dialysis Industry, whereby its unique composition of evenly distributed electrolytes was the result of our exacting production technology. With GranuFlo's distinctive proportional component blend in each bag, Fresenius claimed it made the safest choice for onsite concentrate mixing;

  b.  GranuFlo was safe for your patients and your staff, as Fresenius' utilization of dry Sodium Diacetate eliminated the need for hazardous liquid glacial Acetic Acid, making GranuFlo the safest dry acid product;

  c.  The Dry Acid Advantage



d. GranuFlo Dry Acid Dissolution System eliminated 55-gallon drums providing clinics with valuable storage space (4 times the concentrate with the same amount of space). One pallet consisted of four (4) 55- gallon drums, which was equivalent to 220 total gallons of liquid acid concentrate. One pallet of GranuFlo dry acid concentrate consisting of 48 cases, equivalent to 792 gallons - a ratio of nearly 4 to 1; and

e. The cost advantage of dry acid allowed Fresenius to deliver the most competitive price per gallon over liquid concentrate, while at the same time, offering superior clinical outcomes.

80.     Many acid concentrates contain acetic acid or citric acid; however, GranuFlo contains sodium diacetate. Sodium diacetate is equally composed of acetic acid and sodium acetate. As with the chemical reaction discussed above, when sodium diacetate combines with bicarbonate to make the dialysate, the acetic acid portion consumes an equal amount of bicarbonate and produces and equal amount of acetate. The sodium acetate portion, however, does not consume bicarbonate. Instead, it enters the bloodstream without reacting where because it is also a bicarbonate precursor it is metabolized by the liver resulting in an unintended increase in the amount of bicarbonate delivered during dialysis.

**C.     The problem - elevated bicarbonate levels**

81.     Due to GranuFlo's combination of both acetic acid and sodium diacetate, GranuFlo can dangerously increase bicarbonate levels beyond the levels prescribed by a patient's physician.

82.     Acidosis is an increased acidity in the blood caused by the body's inability to excrete acid due to kidney failure. It is a typical occurrence for patients with kidney failure.

83.     Severe acidosis can lead to shock or death.

84.     Dialysis attempts to correct an acidotic state, in part, by adding bicarbonate to the patient's blood.

85.     The opposite of acidosis is alkalosis where a patient's blood has excess base (alkali).

86.     Alkalosis is caused by too much bicarbonate in the blood.

87.     Symptoms of alkalosis include confusion, tremors, light-headedness, muscle twitching, nausea, vomiting, numbness, and/or tingling in the face, hands, or feet.

88.     Alkalosis can cause a patient to experience seizures, severe breathing difficulties, cardiac arrhythmias, and/or death.

89.     Dialysis primarily entails the removal of waste products from the body, promotion of electrolyte balance in the blood, and addition of bicarbonate to the patient's blood to correct acidosis.

90.     The dialysate used during dialysis is a mixture of a bicarbonate concentrate and an acid concentrate (Granuflo and/or NaturaLyte are the acid concentrate portions). The dialysate (bicarbonate and acid solutions) then flows through the dialyzer and interacts with the patient's blood.

91.     Bicarbonate concentrate is used on all dialysis patients, but the amount of bicarbonate delivered to a patient can be adjusted depending on the patient's needs.

92.     All acid concentrates (liquid or dry) contain acid. NaturaLyte contains acetic acid, whereas GranuFlo Acid contains sodium diacetate.

93.     Patients with renal failure tend to become acidotic, and that problem is corrected primarily by adding bicarbonate to their blood. Therefore, all dialysate solutions contain bicarbonate to correct the naturally occurring acidosis in patients with renal failure.

94.     Granuflo is an acid concentrate used in the creation of dialysate.

95.     NaturaLyte, a liquid acid concentrate, yields a concentration equal to 4 meq/L of acetate when put into solution for use in dialysis.

96.     GranuFlo Acid, a dry acid concentrate, yields a concentration equal to 8 meq/L of acetate when put into solution for use in dialysis.

97.     GranuFlo has been on the market for many years and is unique in the dialysis industry because it contains sodium diacetate. GranuFlo increases the amount of acetate in dialysate (the fluid and solutes in a dialysis process that flow through the dialyzer machine).

98.     When introduced into the body, the liver converts the acetate contained in acid concentrates into bicarbonates, which increases bicarbonate levels in the blood.

99.     Granuflo is intended to be used in conjunction with a sodium bicarbonate concentrate.

100.    GranuFlo Acid contains sodium diacetate (two acetates), whereas liquid products, like NaturaLyte contain only acetic acid with one acetate. Once in the body, one molecule of acetate is converted by the patient's liver into one molecule of bicarbonate. However, every molecule of sodium *diacetate* is converted in the liver into *two molecules of bicarbonate*. Thus, the net effect of the conversion of acetic acid contained in NaturaLyte or sodium diacetate contained in GranuFlo is that the patient is exposed to an unanticipated amount of bicarbonate and consequently an unanticipated amount of total buffer that exceeds what was prescribed by the

physician attending to the patient. The conversion of diacetate in the liver to two molecules of bicarbonate results in a higher total buffer than prescribed by the physician.

101.    Dialysis machines must account for the amount of bicarbonate that is prescribed by the physician, and they must provide the clinic and technicians with an ability to confirm that what is delivered to the patient is the total amount of bicarbonate prescribed for administration to the patient.

102.    Bicarbonate levels are described in terms of milliequivalents per liter (mEq/L). When GranuFlo and/or NaturaLyte is used, it adds, respectively, 8 and 4 mEq/L to the total amount of bicarbonate delivered to the patient. In 2005, Fresenius estimated that for every 4 mEq/L decrease or increase in dialysate total buffer there will be corresponding 1-2 mEq/L change in the pre-dialysis serum bicarbonate. According to internal Fresenius documents, GranuFlo can add as much as 3-4 meq/L of buffer to the amount in total delivered to the patient.

103.    The net effect of the additional bicarbonate administered to patients by GranuFlo is that a significant number of dialysis patients develop an unexpectedly rapid increase in elevated levels of bicarbonate in their blood during dialysis, as well as the potential for added serum bicarbonate post dialysis as the acetate in the blood continues to metabolize into bicarbonate. Patients with elevated bicarbonate levels in their blood suffer from metabolic alkalosis, the opposite of acidosis, and high bicarbonate levels in the blood increases a patient's risk of cardiopulmonary arrest ("CP") or sudden cardiac arrest.

104.    The term "total buffer level" refers to the sum of the bicarbonate from the base and the bicarbonate converted from the acetate in the acid portion of the dialysate. Thus, if there are 33 mEq/L of bicarbonate from the bicarbonate concentrate and 4 mEq/L of acetate from the acid concentrate, the total buffer level is approximately 37 mEq/L.

105.    At all relevant times, Fresenius knew, or should have known, that the addition of an acid concentrate of acetic acid or sodium diacetate (acetic acid plus acetate) contained in GranuFlo would lead to a dangerous increase in serum bicarbonate levels in patients undergoing hemodialysis. Fresenius knew, or should have known, that this contributes to metabolic alkalosis, which is a significant risk factor associated with many health problems including heart arrhythmia, cardiopulmonary arrest, and sudden cardiac arrest.

106.    In a patent application assigned to Fresenius, which was filed on May 17, 2006, but which references a provisional application filed exactly one year earlier, the application describes an invention which takes into account "a contribution of bicarbonate resulting from metabolism of acetate contained in an acid dialysate constituent." The application also contains a diagram of machine settings when using GranuFlo that clearly shows the extra contribution of 4 mEq/L of bicarbonate to the overall amount of buffer. Fresenius also knew that its dialysis machines required special instructions when using GranuFlo to reduce the risk of dangerously high bicarbonate levels associated with the concentrated GranuFlo dialysate. Certain communications in this timeframe demonstrate that Fresenius dialysis machines required a "halving" of the Acetate Value when entering the value in the operator settings in preparation for patient treatment. Stated otherwise, during 2008, Fresenius employees were being advised to reduce the amount of bicarbonate in dialysis treatment through manipulation of the dialysis machine settings. Despite this internal knowledge, Fresenius chose not to inform the nephrology/dialysis medical community at large, and users of GranuFlo of the dangers associated with the product and the discrepancy in dialysis machine data entry until just before the FDA initiated a Class I recall in March 2012.

21

107.    During 2008, some members of the dialysis medical community discovered that GranuFlo caused unintended dangerously elevated bicarbonate levels and, on information and belief, Fresenius' employees were aware of this problem prior to 2005.

108.    As such, starting in 2008, Defendants began advising employees in their Fresenius clinics to reduce the amount of bicarbonate in dialysis treatment by manipulating the dialysis machine settings. Defendants revised the instruction manual that was used by operators for certain Defendant-manufactured dialysis machines, including the 2008T model. The revisions instructed users: "When entering the Acetate value for GranuFlo concentrate, only half of the listed value on the label should be entered. For example, if the label shows an Acetate value of 8, then only enter 4." (2008T Machine Operator's Manual PIN 490122 Rev E Copyright 2008- 2010).

109.    In April 2009, Defendants' employees, including their Chief Medical Officer Dr. Raymond Hakim, M.D., Ph. D., attended a four-day conference in Boston, Massachusetts entitled "ESRD: State of the Art and Charting the Challenges for the Future." The main purpose of the conference was to "address the lack of improvement in dialysis patient survival over the last twenty years." Dr. Hakim served on the Steering Committee for the conference.

110.    The conference was attended by Fresenius employees, including Dr. Hakim, who also served on the Steering Committee for the conference.

111.    At the conference, attendees were advised that "sudden cardiac death was identified as the #1 cause of death for dialysis patients, accounting for 59% of cardiovascular-related deaths." These deaths were attributed to factors other than atherosclerotic disease. Specifically, the cardio-pulmonary arrest-related deaths were caused by "uremic cardiomyopathy, characterized by left ventricular hypertrophy (L VH), L V dysfunction, and L V dilatation." In less technical terms, the enlarged muscle walls of the left ventricle become fibrotic and fail to conduct electrical impulses

correctly. This happens because of repeated and continual fluid overloads in the body, which is a common occurrence in patients on dialysis because of their reduced urine production.

112.    Following the conference, from January 1 to December 31, 2010, Dr. Hakim and other Fresenius employees conducted a case-control study to determine what was killing patients in Fresenius clinics. The study revealed that 941 patients from 667 facilities suffered from cardiopulmonary arrest while in Fresenius' facilities. This figure is over six times higher than that of competing products.

113.    Sometime in 2009 or 2010, Fresenius revised the manual used by operators for certain Fresenius-manufactured dialysis machines, including the 2008T model. The revisions instructed users that *"[w]hen entering the Acetate value for GranuFlo concentrate, only half of the listed value on the label should be entered. For example, if the label shows an Acetate value of 8, then only enter 4."* (2008T Machine Operator's Manual *PIN* 490122 Rev E Copyright 2008- 2010).

114.    On September 15, 2010, the FDA sent a Warning Letter to Fresenius after an investigation revealed that, among other things, Fresenius was inadequately addressing complaints filed by patients using the company's products. The letter addressed five major areas of fault, including, but not limited, to the "[f]ailure to establish procedures for investigating the cause of nonconformities stemming from incidents pertaining to NaturaLyte Acid Concentrate" and "[f]ailure to establish and maintain an adequate preventative action to ensure identification of actions needed to correct and prevent problems."

115.    On or about November 4, 2011, Dr. Hakim authored the Fresenius Secret Memo referenced above entitled "RE: Dialysate Bicarbonate, Alkalosis, and Patient Safety, which summarized the results of the case-control study." *See* Exhibit B, *Fresenius Secret Memo*.

116.    The Fresenius Secret Memo concluded, among other things that:

a. Recent analyses performed using FMCNA hemodialysis (HD) patient safety data confirms that alkalosis is a significant risk factor associated with cardiopulmonary (CP) arrest in the dialysis unit,

b. The major cause of metabolic alkalosis in dialysis patients is inappropriately high dialysate total buffer concentration. As recommended in previous communications, physicians should individualize dialysate bicarbonate and total buffer prescriptions independent of and additive to the risk of CP arrest associated with pre-dialysis hypokalemia. We further recommend that pre-dialysis serum bicarbonate level of >24 mEq/L should prompt immediate review of dialysate bicarbonate prescription.

c. Over time, the progressive shift towards higher *pre-dialysis* serum bicarbonate level not only implies that more patients have alkalosis prior to dialysis, but that an even higher percentage of patients have alkalosis post-dialysis.

d. The current analysis determined that "*borderline elevated pre-dialysis bicarbonate levels and overt alkalosis are significantly associated with 6 to 8 fold greater risk of CP arrest and sudden cardiac death in the dialysis facility*" [Emphasis added].

e. In light of these troubling findings, we strongly recommend that physicians adjust dialysate bicarbonate prescriptions monthly for individual patients, with immediate attention to patients with serum pre-dialysis bicarbonate level of >24 mEq/L. The bicarbonate prescription entered into the dialysis machine underestimates the total buffer that the patient receives from the dialysate - by - 8 mEq/L in the case of dialysate prepared from GranuFlo (powder) or by -4 mEq/L in the case of dialysate prepared from NaturaLyte (liquid) - since acetate is rapidly converted into bicarbonate by the liver. Please familiarize yourself with the formulation utilized in each of your facilities and consider lower bicarbonate prescriptions (e.g. 31-33 mEq/L so that total buffer is no greater than 39-41 mEq/L when using GranuFlo), and adjust monthly depending on each patient's pre-dialysis bicarbonate level.

f. A case-control study evaluated risk factors in HD patients who suffered from CP arrest in the facility (N=941 patients from 667 facilities) compared to other HD patients (N=S0,516) within the same facilities between January 1 and December 31, 2010.

The report made the following recommendations:

a. Pre-dialysis alkalosis and hypokalemia are modifiable risk factors associated with CP arrest. Previous reports have identified hypokalemia as a risk factor for cardiac arrest and sudden cardiac death in the HD facility and this was related to the use of low potassium dialysate (OK, 1 K). Thus, FMCNA policies and practices have required routine review of dialysate potassium orders and have limited use of very

24

low potassium dialysate. However, there has not been enough of a quality focus on alkalosis because the clinical guidelines have primarily emphasized avoidance of metabolic acidosis.5 Over time, there has been a shift towards higher dialysate bicarbonate prescriptions accompanied by increasing serum bicarbonate levels before dialysis and presumably much higher post dialysis. This issue needs to be addressed urgently.

b.  High pre-dialysis serum bicarbonate level was independent of and may potentiate the death risk associated with low pre-dialysis serum potassium. It is an actionable risk factor, by individualization of dialysate bicarbonate prescriptions to keep patients' pre-dialysis serum bicarbonate within a narrower range and to avoid alkalosis. We strongly recommend that physicians individualize dialysate prescriptions, review them monthly, with consideration of patient's pre-dialysis bicarbonate and dialysate total buffer, with immediate attention to decreasing prescribed dialysate bicarbonate in patients with pre-dialysis bicarbonate level of >24 mEq/L.

c.  Many facilities have converted to the Fresenius powdered "GranuFlo" formulation that has total buffer equal to "prescribed bicarbonate plus 8" - due to 4 mEq/L of sodium acetate in addition to the 4 mEq/L of acetic acid (acetate). There are instances whereby the physicians' bicarbonate prescriptions were kept the same when shifting to power concentrate (GranuFlo) (failing to account for the additional 8 mEq/L of sodium acetate), thus exposing patients to a higher total buffer load than intended. While >60% of current dialysate prescriptions are for 37 mEq/L of bicarbonate, it may be prudent to initially target a prescription of 31-33 mEq/L of dialysate bicarbonate (with total buffer greater by up to -8 mEq/L from acetate) and adjust according to patients' monthly bicarbonate level. Please recall also that an additional source of bicarbonate may be the phosphate binders that are prescribed to patients.

The Fresenius Secret Memo also reflected:

Previously, several memos were sent to you from the Medical Office to explain the difference in total buffer between Naturalyte (liquid) and GranuFlo (powder) dialysate formulations. The information was accompanied by a recommendation to address pre-dialysis alkalosis found in an increasing proportion of your patients, by decreasing the prescribed dialysate bicarbonate as needed. These previous memos, as well as a related article in the Medical Staff Newsletter, are accessible via Doctors Corner and also upon request. In addition, two presentations containing relevant information were recently presented at the Medical Directors' Symposium, one by Brooks Rogers and the other by Dr. Jeff Sands and both are also available for download in Doctors Corner.

**D.**    **Fresenius failed to adequately disclose the associated risks of GranuFlo**

25

117.    For numerous years, Fresenius withheld vital critical GranuFlo related information from its own clinical staff, and from the clinical staff of its non-Fresenius customers that could have prevented numerous adverse heart attacks and deaths.

118.    Based on Defendants' knowledge of the chemical structure and resulting metabolic process in the human body, combined with the knowledge readily available to Defendants as early as 2004, Defendants knew or should have known of the increased risk of metabolic alkalosis attributed to the use of GranuFlo.

119.    During this time, Defendants also knew that their dialysis machines required special instructions when using GranuFlo to reduce the risk of dangerously high bicarbonate levels associated with the concentrated GranuFlo dialysate.

120.    Upon information and belief, as early as 2004, Fresenius was aware that patients with increased pre-dialysis metabolic alkalosis levels were more likely to experience a heart attack or sudden cardiac death if the bicarbonate prescription was not lowered.

121.    Prior to the FDA recall, Fresenius knew that the use of GranuFlo in the dialysis process resulted in dangerously increased bicarbonate levels. In 2010, Fresenius conducted a clinical study, which revealed that 941 patients in 667 Fresenius dialysis facilities had cardiopulmonary arrests and that the patients' risk of cardiopulmonary arrest was up to six times higher if they had an elevated pre-dialysis bicarbonate level. On November 4, 2011, Fresenius issued an internal memo ("the Fresenius Secret Memo") disclosing the results of this study. Fresenius shared the Fresenius Secret Memo with its own dialysis clinical staff, but they did not disclose it to their non-Fresenius outside customers.

122.    At some point, a copy of the Fresenius Secret Memo was anonymously leaked to the FDA. On March 27, 2012, Fresenius received an inquiry from the FDA regarding the

GranuFlo-related products and alkalosis. After the FDA inquiry, on March 29, 2012, Fresenius finally released a 2-page, stripped-down, scientifically-vague, memo to its non-Fresenius customers that omitted critical information and references contained in the Fresenius Secret Memo. *See* Exhibit C, *Fresenius Bulletin*.

123.    Despite this internal knowledge, Defendants chose not to inform other non-Fresenius clinics, the nephrology/dialysis medical community at large, and/or end users of GranuFlo of the dangers associated with their product and the discrepancy in dialysis machine settings and data entry.

124.    From 2008 through 2010, Fresenius failed to notify all users of Fresenius concentrated dialysate, GranuFlo, of the necessity to "halve" Acetate levels when setting the parameters on dialysis machines while using these products. To the extent Fresenius provided information, it did so partially, selectively, and haphazardly in a way that was calculated to avoid general dissemination of necessary warnings, instructions and problems associated with its products. Fresenius' failure to fully and forthrightly inform and warn the medical/dialysis community directly affected patient health and safety and led to the deaths of innumerable innocent patients.

125.    The Fresenius Secret Memo was purposefully released solely to Fresenius' own dialysis clinics, facilities, doctors, and technicians, warning of the significant risk of cardiac arrest and sudden cardiac death in patients with elevated bicarbonate levels as a result of using GranuFlo in dialysis treatments. Fresenius did not provide copies of the Fresenius Secret Memo to non-Fresenius companies and dialysis clinics that used GranuFlo, which they purchased from Fresenius or, otherwise, inform those companies or clinics.

126.    The Internal Memo advised Fresenius dialysis clinics to "familiarize yourself with the formulation utilized in each of your facilities and consider lower bicarbonate prescriptions ... and adjust monthly depending on each patient's pre-dialysis bicarbonate level."

127.    On November 16, 2011, 12 days after the Fresenius Secret Memo was released, Fresenius issued a press release indicating that Dr. Hakim was stepping down as Fresenius' Medical Director as of December 12, 2011, and that he would be replaced by Dr. Frank Maddux.

128.    Sometime in March 2012, over four months after the Fresenius Secret Memo was circulated to Fresenius clinics or companies, the memo was anonymously leaked to the FDA.

129.    Upon information and belief, on March 27, 2012, Fresenius received an inquiry from the FDA with regards to the GranuFlo-related products and alkalosis.

**E.    The bulletin and FDA recall**

130.    On March 29, 2012, 2 days after the FDA inquiry, Fresenius finally released a 2-page, abbreviated, scientifically-vague, memo to its non-Fresenius customers warning doctors of the dangers associated with its products. The abbreviated memo omitted critical information and references contained in the original Fresenius Secret Memo. The abbreviated memo concluded among other things that:

> Previous reports have identified an association between elevated pre-dialysis bicarbonate levels and an increased mortality risk. Recent analyses performed using FMCNA hemodialysis (HD) patient safety data confirms that alkalosis is a significant risk factor associated with cardiopulmonary (CP) arrest in the dialysis unit, independent of and additive to the risk of CP arrest associated with pre-dialysis hypokalemia. A major cause of metabolic alkalosis in dialysis patients is inappropriately high dialysate total buffer concentration.

[*See* Exhibit C, *Fresenius Bulletin*].

131.    The March 29, 2012 memo further stated that:

> Recent analyses performed by FMCNA [Fresenius Medical Care North America] hemodialysis (HD) patient safety data confirms that alkalosis [high

levels of bicarbonate] is a significant risk factor associated with cardiopulmonary (CP) arrest in the dialysis unit, independent of and additive to the risk of CP arrest associated with pre-dialysis hypokalemia. A major cause of metabolic alkalosis is dialysis patients is inappropriate high dialysate total buffer concentration.

*See id.*

132.    The March 29, 2012 notice contained an "urgent product notification involving the NaturaLyte and GranuFlo powder product lines" and recommended that "clinicians exercise their best judgment regarding bicarbonate and total buffer base prescriptions for each patient." *See id.*

133.    Fresenius failed to adequately warn of the dangers associated with the use of GranuFlo when it manufactured, distributed, and concealed those dangers from the public and the FDA up to and including March 29, 2012.

134.    Additionally, on March 29, 2012, the FDA reported Fresenius' voluntary Class 1 recall of GranuFlo, which warned users of the heightened risk for low blood pressure, hypokalemia (low potassium levels), hypoxemia (low blood oxygen), hypercapnia (high carbon dioxide levels), cardiac arrhythmia, and possibly sudden death associated with the use of its products.

135.    On May 2012, the FDA issued a safety communication recommending that "[h]ealth care providers should review the dialysate acid concentrate labeling for the specific concentrate that they prescribe to determine the components that can contribute to the patient's overall bicarbonate levels." *See* Exhibit "D" *FDA Memo: Dialysate Concentrates Used in Hemodialysis: Safety Communication – Alkali Dosing Errors*. This communication was as a result of a complaint it received describing alkali dosing errors that occurred during dialysis. *Id.*

136.    On June 25, 2012, the FDA issued a Class I recall of GranuFlo because the use of GranuFlo could result in high bicarbonate levels, which resulted in metabolic alkalosis, a condition

that had been linked to a nationwide epidemic of dialysis-related adverse cardiac events including arrhythmia, heart attacks, strokes, and death. [*See* Exhibit E, *FDA Recall Notice*].

137.    Class I recalls are the most serious type of recall and involve situations in which there is a reasonable probability that use of these products will cause serious adverse health consequences or death.

138.    As such, Fresenius is currently under investigation by the FDA for its failure to warn known users of its products of the risks associated with such usage of its products.

139.    The FDA issued a statement to the public indicating that the reason for the recall was because:

> The manufacturer is cautioning clinicians to be aware of the concentration of acetate or sodium diacetate (acetic acid plus acetate) contained in Fresenius' Naturalyte Liquid and Granuflo Dry Acid Concentrate. Inappropriate prescription of these products can lead to a high serum bicarbonate level in patients undergoing hemodialysis. This may contribute to metabolic alkalosis, which is a significant risk factor associated with low blood pressure, hypokalemia, hypoxemia, hypercapnia and cardiac arrhythmia, which, if not appropriately treated, may culminate in cardiopulmonary arrest. This product may cause serious adverse health consequences, including death.

*See* Exhibit "F" *FDA Recall*. As per the FDA, it issued a general safety communication related to inappropriate prescription and resultant alkali dosing errors in the dialysate concentrates used in hemodialysis. *Id.*

140.    The Class I Recall of GranuFlo and NaturaLyte by the FDA indicated that the "[i]nappropriate prescription of these products can lead to a high serum bicarbonate level in patients undergoing hemodialysis." *Id.*

**F.    The defective nature of GranuFlo**

141.    Fresenius's breaches of warranty, acts of negligence, and/or other wrongful acts, by and through its agents, servants, workmen, and employees, were the direct and

proximate causes of the injuries suffered by Enrollees, as a result of being administered GranuFlo, in that they:

    i.   failed to properly design, manufacture, and test GranuFlo;

    ii.   sold, marketed, and distributed GranuFlo in a dangerously defective condition;

    iii.   sold, marketed, and distributed GranuFlo when it was not reasonably fit and suitable for its ordinary and intended purpose;

    iv.   failed to adequately warn purchasers and users of GranuFlo's defective condition before, during and after sale and delivery of the product;

    v.   failed to properly inspect and test GranuFlo;

    vi.   sold, marketed, and distributed GranuFlo when they knew or should have known of its inherent design defects;

    vii.   failed to properly and fully investigate prior incidents involving deaths and other personal injuries related to the use of GranuFlo during dialysis;

    viii.   failed to correct known design and engineering deficiencies; and

    ix.   failed to properly or adequately address defects in GranuFlo and implementing an inadequate Recall Campaign that defendants knew or should have known was deficient and not likely to correct the defects and dangers inherent in GranuFlo.

142. Defendants' failure to disclose the defective nature of GranuFlo, the limited reach of its recall campaign, and the failure to notify the families of patients who suffered cardiac arrest, sudden cardiac death, and other adverse cardiac events during dialysis, of the association between GranuFlo and these injuries prevented the Assignors from knowing that their Enrollees' injuries were potentially related to the use of the defective GranuFlo product until August 2012.

### G.    MSP Recovery's Assignors were injured as a result of GranuFlo's defect

143.    MSP Recovery's Assignors made payments on behalf of, or otherwise became financially responsible for their Enrollees' medical expenses, which were incurred as a result of the defective GranuFlo product.

144.    It is the custom and practice of CMS and primary plans to maintain records in a detailed electronic format. According the U.S. Department of Health and Human Services (HHS), CMS, federal statutes, and industry best practices and guidelines, the standard format for storing digital health insurance claims data is an electronic data interchange ("EDI") format called 837P ("837").[7]

145.    Essential components of an 837-claim file include but are not limited to the date(s) of service, diagnosis code(s) and medical procedure code(s).

146.    Using a proprietary software system designed and developed by MSP Recovery (the "MSP System"), Plaintiffs can capture, compile, synthesize, and funnel large amounts of data from different sources to identify instances where the Assignors incurred medical expenses resulting from injuries caused by GranuFlo.

147.    The MSP System uses ICD-9-CM or ICD-10-CM medical diagnosis codes and DRG, ICD-9-PCS, ICD-10-PCS, HCPCS, or CPT procedure codes to identify and obtain information regarding Enrollee claims, such as the type of injury suffered and the cause of the injury.

---

[7] Department of Health and Human Services, Centers for Medicare and Medicaid. Medicare Billing: 837P and Form CMS 1500 (2016), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/837P-CMS-1500.pdf.

148.    The MSP System creates algorithms based on National Provider Identifier ("NPI") codes, a unique 10-digit number issued by CMS to identify covered health care providers that rendered medical items or services to Plaintiffs' Assignors' Enrollees. As outlined by the Federal Code of Regulation, covered health care providers must also share their NPI code with other providers, health plans, clearinghouses, and any entity that may need it for billing purposes. As a result, the MSP System can identify Defendants in its claims data through the use of NPI codes.

149.    Using claims data from its Assignors and data acquired from outside sources (e.g., CMS), the MSP System can also identify the amounts owed.

150.    After analyzing claims data obtained from the Assignors using the MSP System, MSP Recovery identified Enrollees for which the Assignors paid for treatments where a dialysis patient suffered injuries relating to metabolic alkalosis. [8] [*See* Exhibit 1, *Claims Data*].

### H.    Fresenius faces *thousands* of GranuFlo lawsuits

151.    As a result of Defendants' acts in selling, marketing, and distributing a dangerously defective product, Fresenius has been and/or is involved in a multitude of lawsuits throughout the country.

152.    Since the factual issues arising from allegations that the Fresenius plaintiffs suffered injury or death caused by the administration GranuFlo during hemodialysis, over 2,127 claims involving the same factual questions and allegations were transferred to the United States District Court, District of Massachusetts, and consolidated into a multi-district litigation case.

---

[8] Additional claims may be identified throughout the course of this litigation, as through discovery, Plaintiffs may identify Enrollees that suffered adverse effects due to the administration of GranuFlo during hemodialysis that they were unable to identify at the time that this complaint was filed.

153.    The lead Case Number is 13-md-02428, wherein this case was transferred, and the cases have been assigned to the Honorable Judge Douglas P. Woodlock.

154.    As a result of the ongoing multidistrict litigation involving Fresenius, a Master Complaint and Demand for Jury Trial was filed on December 12, 2013 by the Plaintiffs' Executive Committee and the Plaintiffs' Steering Committee with the intent to set forth the claims that individual Plaintiffs and/or the estates and/or their heirs of deceased persons may assert against the Defendants.

155.    The Master Complaint alleged claims for: (1) strict liability; (2) negligent failure to warn; (3) negligent design; (4) negligence; (5) negligent misrepresentation; (6) breach of implied warranty of merchantability; (7) breach of implied warranty of fitness for a particular purpose; (8) breach of express warranty; (9) fraud; (10) violation of consumer protection laws; (11) loss of consortium; (12) wrongful death; and (13) survival action.

156.    On or about 2016, Fresenius accepted a $250 million-dollar settlement for more than 4,000 patients awaiting trial, which claimed that GranuFlo led to serious and deadly side effects reached a with Fresenius.  The settlement was made "in principle."

157.    On or about February 2019, the Kentucky Office of the Attorney General entered into a $5 million-dollar settlement with Fresenius over allegations of Medicaid fraud. The settlement resolves claims that Fresenius violated Medicaid guidelines by failing to warn Kentucky dialysis clinics and doctors from 2003 through 2012 that GranuFlo could result in dangerously increased bicarbonate levels.

158.    Additionally, numerous class action lawsuits were filed against Defendants. Some of these cases are delineated below:

***Brysten, Executrix of the Estate of Filmon Brysten v. Fresenius Medical Care Holdings. Inc., et al.,* Case No. 13-cv-11828-DPW**

159.    In 2013, a Civil Class Action Complaint was filed in Pennsylvania against FMCNA, FUSA, Fresenius Marketing, and Fresenius Manufacturing.   The class action complaint was filed on behalf of Ms. Brysten and all her similarly situated individuals in Pennsylvania who suffered personal injuries and/or wrongful death resulting from the use of NaturaLyte Liquid and GranuFlo Acid Concentrates in dialysis treatment.

160.    On July 5, 2013, Fresenius removed the proceedings to the United States District Court for the Eastern District of Pennsylvania, Case No. 13-cv-11828-DPW, and alleged federal jurisdiction was proper.

161.    The proposed class in the complaint was defined as:

"All patients in the State of Pennsylvania, including the heirs, beneficiaries, and next of kin of such patients, who received GranuFlo in dialysis treatment and suffered cardiopulmonary arrest, sudden cardiac death, or other adverse cardiac events."

162.    The complaint alleged claims for: (1) strict liability; (2) breach of implied warranty of merchantability; (3) breach of implied warranty of fitness for a particular purpose; (4) negligent failure to warn; (5) negligent design defect; (6) negligence; (7) negligent misrepresentation; (8) breach of express warranty; (9) fraud; (10) wrongful death; and (11) fraudulent concealment.

163.    On April 5, 2013, the action was transferred to MDL Case No. 2428-DPW.

164.    On December 11, 2018, the action was dismissed, with prejudice.

***Rodriguez v. Fresenius USA, Inc., and DOES 1-50, Case No. BC519374***

165.    On August 23, 2013, a Class Action Complaint was filed before the Superior Court of the State of California in the matter of ***Rodriguez v. Fresenius USA, Inc., and DOES 1-50, Case No. BC519374.***

166.     This class action was brought under the provisions of the California Code of Civil Procedure § 382, whereby plaintiffs and the proposed class members were consumers who underwent hemodialysis treatment, in the State of California, since January 2000, wherein the product known as GranuFlo was used and paid for, in all or part, which Defendants designed, labeled, packaged, researched, tested, manufactured, marketed, advertised, sold, promoted, and/or distributed for use during hemodialysis.

167.     The proposed class was defined as:

All consumers who underwent hemodialysis treatment in the State of California wherein the product known as GranuFlo was used and paid for, in all or part, since January 2000. Excluded from the proposed class are Defendants; any entities in which any of the Defendants have a controlling interest; and the officers, directors, affiliates, attorneys, heirs, predecessors, and successors in interest, subsidiaries, employees, agents and/or assigns of any of the Defendants.

168.     The complaint alleged claims for: (1) violation of California Consumer Legal Remedies Act, Business and Professions Code 1750; (2) violation of California Unfair Competition Law, Business and Professions Code Section 17200, *et seq.*; (3) violation of the California False Advertising Law, Business and Professions Code Section 17500, *et seq.*; (4) violation of the California Civil Code §§ 1709, 1710, 1711, Deceit by Concealment; and (5) unjust enrichment

### *Berzas. v. Fresenius Medical Care Holdings, Inc.,*
### *Case No. 13-cv-00529-SM-DEK (E.D. La. 2013).*

169.     On March 21, 2013, Allan Berzas *et al*. filed a Class Action Complaint against Fresenius Medical Care Holdings, Inc., FMCNA, FUSA, Fresenius Manufacturing, Fresenius Marketing, Fresenius Medical Care Ag & Co. KGAA, Fresenius Medical Care Management, Ag, Fresenius Se & Co. KGAA, and Fresenius Management, SE.

170.     The proposed class was defined as:

> All consumers and third-party payors in the United States and its territories who, for purposes other than resale, purchased, reimbursed and/or paid for NATURALYTE and/or GRANUFLO from May 1, 2003 to present. For purposes of the Class definition, individuals and entities "purchased" NATURALYTE and/or GRANUFLO if they paid some or the entire purchase price.

171.    *Berzas* seeks, among other things, all general and compensatory damages, all special damages, all hedonic damages, and a refund of all monies acquired from the sale of GranuFlo to the plaintiffs and the class.

172.    Excluded from the Class are Defendants and any entity in which any Defendants have a controlling interest, and their legal representatives, officers, directors, assignees, and successors. Also excluded from the class is any judge or justice to whom this action is assigned, together with any relative of such judge or justice within the third degree of relationship, and the spouse of any such person.

173.    The class action complaint alleged claims for: (1) Louisiana Products Liability Act; (2) violations of Consumer Protections Statutes in 43 states;[9] (3) violations of warranty of redhibition; and (4) unjust enrichment.

174.    On April 10, 2013, the proceedings were conditionally transferred to this Court in the matter of *In Re: Fresenius GranuFlo/NaturaLyte Dialysate Products Liability Litigation*, Case MDL No. 2428.  As a result of the transfer from the Eastern District of Louisiana, Case No. 13-529 was transferred and opened under Case No. 13-10843.

---

[9] Count III of the *Berzas* complaint alleges that Fresenius engaged in unfair competition or unfair or deceptive acts or practices in violation of consumer protection laws in the following states: Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming.

175.     On March 18,2014, the following plaintiffs in the *Berzas* complaint filed Short-Form Complaints: (1) Earmessa Moncriffe o/b/o Annie Moncriffe; (2) Robert Couch, Jr. o/b/o June Couch; (3) Jacquelne Parrish o/b/o Julian Parrish, II; (4) George Shelling, Sr. o/b/o Gwendolyn Durand Shelling; and (5) Angela D. Turner o/b/o Myles Turner, Jr.

176.     On June 27, 2014, the claims of Allan Berzas and Christy Pigeon in the *Berzas* complaint were dismissed as a result of a Stipulation of Dismissal.  The claims of all other plaintiffs in the *Berzas* Complaint were not dismissed as a result of the stipulation.

177.     On October 22, 2016, this Court issued an Order, *applicable to all cases in the MDL*, to establish a Qualified Settlement Find for GranuFlo settlement and resolution program, and to appoint a QSF Administrator.

178.     On April 11, 2017, Defendants filed an Omnibus Motion to Dismiss with prejudice 631 active cases in this multi-district litigation where the plaintiffs elected not to opt-in to the global settlement and failed to comply with Case Management Order No. 17. One of the cases that Defendants asked to dismiss was *Berzas, Allan et al*., Case No. 13-cv-10843.

179.     The GranuFlo Settlement Fund was established as a Qualified Settlement Fund, wherein Providio MediSolutions, LLC was appointed as Administrator of the Qualified Settlement Fund and Trustee, wherein they were granted the authority to conduct any and all activities necessary to administer the fund.

180.     MSP Recovery falls within the class definition, as its Assignors are third-party payors in the United States that paid some or the entire purchase price of GranuFlo.

181.     To date, the class has not been certified.

182.     Upon information and belief, the lawsuit remains open.

**IV.     STATUTE OF LIMITATION TOLLING ALLEGATIONS**

183.    Plaintiffs assert all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling and class action tolling.

184.    Despite diligent investigation by Plaintiffs into the cause of their injuries, including consultations with Plaintiffs' medical providers, the nature of Plaintiffs' injuries and damages, and their relationship to the products was not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiffs' claims.

185.    Plaintiffs' claims are tolled by the applicable statutes of limitations tolling provisions, as held by the Supreme Court of the United States in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974).

186.    The accrual and running of any applicable statute of limitations has been tolled since March 21, 2013.

187.    On March 21, 2013, *Berzas*, a putative class action was filed in the United States District Court for the Eastern District of Louisiana against Fresenius Medical Care Holdings, Inc., FMCNA, FUSA, Fresenius Manufacturing, Fresenius Marketing, Fresenius Medical Care Ag & Co. KGAA, Fresenius Medical Care Management, Ag, Fresenius Se & Co. KGAA, and Fresenius Management, SE alleging that Fresenius negligently, recklessly, and/or willfully manufactured GranuFlo and, subsequently, intentionally, recklessly, and/or negligently failed to advise and/or warn dialysis patients, including the plaintiffs, decedents, their customers (i.e., treating physicians, healthcare facilities, distributors), their suppliers, the government, other payers and/or the general public of the serious consequences and risks of GranuFlo.

188.    The *Berzas* complaint alleged that the use of GranuFlo can result in dangerously high bicarbonate levels that cause metabolic alkalosis—a significant risk associated with low blood pressure, hypokalemia, hypoxemia, and cardiac arrhythmias.

189.    The plaintiffs in *Berzas* sued on their own behalf, wherein they suffered injuries and damages as a result of their exposure to GranuFlo, wherein the damages included heart attacks, deaths, hypotension, myocardial infarction, and/or heart problems.

190.    In addition, the plaintiffs in *Berzas* brought suit on behalf of a putative class defined as: "[a]ll consumers and third-party payors in the United States and its territories who . . . "purchased" NATURALYTE and/or GRANUFLO if they paid some or the entire purchase price."

191.    MSP Recovery's claims fall within the class definition of the *Berzas* complaint, as during all time periods relevant to this lawsuit, MSP Recovery's Assignors were third-party payors in the United States who purchased, were reimbursed, and/or paid for some or the entire purchase price of GranuFlo on behalf of their Enrollees between May 1, 2003 and March 21, 2013, the date *Berzas* was filed.

192.    The *Berzas* complaint has not been certified, and upon information and belief, the case remains open.

193.    As a result, the running of the statute of limitations on MSP Recovery's claims was tolled from March 21, 2013 and the tolling has continued since that date. Prior to filing suit, Plaintiffs and its Assignors could not have known of the ongoing litigation involving *Berzas*, and would not have learned or known, through reasonable diligence, that the Assignors and/or Enrollees were injured by the acts and omissions of Defendants.  Instead of joining the class in *Berzas*, Plaintiffs decided to file this instant lawsuit.  The differences in the time the cases were

filed does not cause the claims to be lost as a result of the statutory period; rather; the limitations period is suspended.

## V.     MSP RECOVERY SUES FRESENIUS

194.     On September 6, 2018, MSP Recovery filed its Pure Bill of Discovery Complaint against Defendants in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida in the matter of *MSP Recovery Claims, Series, LLC, MSPA Claims 1, LLC, and Series PMPI v. Fresenius Medical Care Holdings, Inc., Fresenius USA, Inc., Fresenius USA Manufacturing Inc., Fresenius USA Marketing, Inc., and Fresenius USA Sales, Inc*., Case No. 2018-030366-CA-01 (hereinafter "MSP Litigation").

195.     On September 11, 2018, MSP Recovery amended its complaint against Defendants.

196.     The Amended Complaint sought a pure bill of discovery under Florida law to seek information from Defendants regarding "any and all registered users of the Defendants' GranuFlo including but not limited to, [] information for each GranuFlo recipient [consisting of their]: (1) Full Name; (2) Social Security Number ("SSN"); Health Insurance Claim Number ("HICN"), or Medicare Beneficiary Identifier ("MBI"); (3) Date of Birth; and (4) Address. [D.E. 1-2]. Essentially, the complaint sought for Defendants to confirm the identity of the proper defendant and the appropriate legal theory of relief. *Id*.

197.     On October 16, 2018, Defendants removed the proceedings to the United States District Court for the Southern District of Florida – Miami Division, *MSP Recovery Claims, Series, LLC, MSPA Claims 1, LLC, and Series PMPI v. Fresenius Medical Care Holdings, Inc., Fresenius USA, Inc., Fresenius USA Manufacturing Inc., Fresenius USA Marketing, Inc., and Fresenius USA Sales, Inc*., Case No. 2018-cv-12231-DPW.

41

198.     On October 25, 2018, the MSP Litigation was transferred to the United States Judicial Panel on Multidistrict Litigation in the matter of *In Re: Fresenius GranuFlo/Naturalyte Dialysate Products Liability Litigation,* MDL No. 2428 (U.S. Jud. Pan. Mult. Lit. 2013).

199.     All the actions before this Court in MDL No. 2428 share common factual questions arising out of allegations that plaintiffs suffered injury or death caused by the use of GranuFlo products during hemodialysis, which allegedly may cause metabolic alkalosis in patients resulting in low blood pressure, hypokalemia, hypoxemia, hypercapnia, cardiac arrhythmia, or cardiopulmonary arrest. All the actions involve factual questions relating to whether GranuFlo were defectively designed or manufactured, whether Fresenius, the manufacturer of these dialysate products, knew or should have known of the alleged propensity of these products to cause injury, and whether it provided adequate instructions and warnings with these products.[10]

200.     On February 7, 2019, this Court held a Status Conference, wherein MSP Recovery was ordered to amend its allegations to identify with specificity the individuals and causes of action by March 11, 2018. This amendment follows.

## VI.     CAUSES OF ACTION

### COUNT ONE
### *Negligence*

246.     Plaintiffs reallege and incorporate by reference the foregoing paragraphs in the complaint as though fully set forth herein.

---

[10] *See In re: Fresenius Granuflo/Naturalyte Dialysate Prod. Liab. Litig.,* 935 F. Supp. 2d 1362, (Mem) – 1363 (U.S. Jud. Pan. Mult. Lit. 2013).

247.    Defendants had a duty to exercise reasonable care in the manufacture, labeling, marketing, sale, packaging and distribution of GranuFlo including a duty to assure that it did not cause unreasonable, dangerous side-effects to users.

248.    Defendants had a duty to exercise reasonable care in providing sufficient information to treating nephrologists and clinics so that they would be aware of, at minimum, (i) the use of GranuFlo; (ii) its dangers; (iii) the amount of acetate in GranuFlo; (iv) the rate at which ESRD patients' metabolize acetate into bicarbonate; and (v) the amount of acetate anticipated to remain in a patient's blood post-dialysis.

249.    Defendants failed to exercise ordinary care in carrying out these duties.

250.    Defendants, thereby, breached their duties.

251.    Defendants were negligent in the design, manufacture, advertising, warning, marketing, packaging, and sale of GranuFlo in that, among other things, they:

     a.    failed to use due care in designing and manufacturing GranuFlo so as to avoid the aforementioned risks to individuals;

     b.    failed to accompany GranuFlo with proper and adequate warnings regarding all possible adverse side-effects associated with its use, dosing instructions and the comparative severity and duration of such adverse effects, including but not limited to serious CP Arrest, sudden cardiac death, and other adverse cardiac events.  The warnings given did not accurately reflect the symptoms, scope, or severity of the side effects;

     c.    failed to provide adequate training and instruction to medical providers for the appropriate use of GranuFlo;

     d.    placed unsafe products into the stream of commerce; and

e. were, otherwise, careless or negligent.

252. Despite the fact that Defendants knew or should have known that GranuFlo caused unreasonable, dangerous side-effects which many users would be unable to remedy by any means, Defendants continued to market GranuFlo to patients, including the medical community and Enrollees.

253. Evidence suggests that Defendants were aware of the dangerous propensity of its products for years, and possibly decades.

254. Defendants' negligence, including the wrongful acts and omissions of its agents, servants, and/or employees, includes:

a. marketing, selling, distributing, and/or advertising GranuFlo without adequately or thoroughly testing to determine whether and under what conditions it was safe for use despite knowing the significant dangers it could pose to dialysis patients;

b. failing to provide adequate instructions and training regarding the safety precautions and procedures to be observed in the administration and use of GranuFlo;

c. failing to adequately and accurately warn Enrollees in Fresenius clinics of the risks and dangers of GranuFlo;

d. constructively representing that GranuFlo was safe for use in dialysis treatment as intended, when in fact, it was not;

e. failing to communicate the dangers and risks associated with the use of GranuFlo to Enrollees and Assignors;

f.   concealing, misrepresenting, or failing to reveal information to Enrollees suggesting that GranuFlo was unsafe, dangerous, and/or did not conform to FDA regulations, or even when GranuFlo would be used;

g.   concealing, misrepresenting, or failing to reveal information to Enrollees, suggesting that GranuFlo presented more severe risks and dangers than other acid concentrates used in dialysis;

h.   providing GranuFlo not in accordance with the prescription of the treating physicians;

i.   introducing new products without adequate testing, evaluation and risk assessment;

j.   failing to conduct pre-dialysis bicarbonate testing frequently enough to detect GranuFlo induced metabolic alkalosis;

k.   failing to conduct post-dialysis bicarbonate testing to detect GranuFlo induced metabolic alkalosis;

l.   using GranuFlo in place of safer alternative acid concentrates; and

m.   failing to communicate to Enrollees' nephrologist complete information regarding the dangers of GranuFlo.

255.   Despite the fact that Defendants knew or should have known that GranuFlo caused unreasonably dangerous side effects, including, but not limited to, cardiac arrest, stroke and even death among other serious conditions, Defendants continued to design, test, manufacture, label, advertise, market, promote, sell, and distribute GranuFlo.

256.   Defendants' negligence was the proximate cause of the injuries and damages alleged herein.

257.   Defendants' conduct, as described above, was extreme and outrageous.

258.    Defendants risked the lives of the patients and users of their products with knowledge of the safety problems and suppressed this knowledge from the general public through their marketing and advertising, as well as other means.  Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct was wanton and willful.

## COUNT TWO
### *Unjust Enrichment*

259.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs in the complaint as though fully set forth herein.

260.    Defendants received benefits from Plaintiffs' Assignors who made payments on behalf of, or otherwise became financially responsible for, their Enrollees' medical expenses incurred as a result of the administration of Defendants' defective GranuFlo product.

261.    By engaging in the conduct set forth above, Plaintiffs' Assignors were forced to make payments on behalf of Enrollees for the medical treatment and services related to the heart attacks, strokes, and other adverse health consequences caused by GranuFlo.

262.    Defendants voluntarily accepted and retained these payments with full knowledge and awareness that, as a result of its wrongdoing, the Assignors paid for GranuFlo when they otherwise would not have done so but for Defendants' wrongful conduct.

263.    Defendants continue to retain those benefits to the detriment of Plaintiffs, the Assignors, and the Enrollees.

264.    Their enrichment is as a result of their deceptive acts and omissions, which has allowed them to gain millions of dollars in profits that would not have been gained but for Defendants' acts.

265.    Defendants are aware of their receipt of those benefits.

266.    In equity and fairness, it is Defendants who should bear the costs of the medical expenses occasioned by the Defendants' irresponsible marketing, promotion, manufacturing, and use of GranuFlo.

267.    By engaging in the conduct set forth above, MSP Recovery is entitled to recover its damages in an amount to be proved at trial.

## COUNT THREE
### *Strict Liability*

268.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs in the complaint as though fully set forth herein.

269.    At the time the Assignors paid for Enrollees' injuries, Defendants' GranuFlo product was defective and unreasonably dangerous to foreseeable patients.

270.    The GranuFlo that was employed during the dialysis treatment received by the Enrollees was in the same, or substantially similar, condition as it was when it left Defendants' possession.

271.    The GranuFlo was not misused or materially altered when GranuFlo was administered during their dialysis treatment.

272.    Defendants are strictly liable for the injuries suffered by the Enrollees and/or Assignors in that Defendants:

      a.  designed, manufactured, distributed, packaged, manufactured, sold, advertised, marketed, and supplied GranuFlo, which was defectively designed and placed into the stream of commerce in a defective and unreasonably dangerous condition;

      b.  failed to properly market, design, manufacture, distribute, supply, package, and sell GranuFlo;

      c.  failed to warn and place adequate instructions and warnings on GranuFlo;

    d.   failed to adequately test GranuFlo;

    e.   failed to provide timely and adequate warnings and instructions after they knew of the risk of injury associated with the use of GranuFlo prior to the injuries suffered by the Enrollees and, subsequently, the Assignors; and

    f.   failed to market a feasible alternative design for the subject GranuFlo that would have prevented the injuries.

273.    Defendants' actions and omissions were the direct and proximate cause of the injuries suffered by the Enrollees and, subsequently, the Assignors.

274.    Defendants' conduct, as described herein, was extreme and outrageous.

275.    Defendants risked the lives of the patients and users of their products with knowledge of the safety problems and suppressed this knowledge from the general public through their marketing and advertising, as well as other means.

276.    Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public.  Defendants' outrageous conduct was wanton and willful, which warrants an award of punitive damages.

## COUNT FOUR
### *Breach of Implied Warranty of Merchantability*

277.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs in the complaint as though fully set forth herein.

278.    At all relevant times herein, Defendants marketed, distributed, and sold GranuFlo to the Enrollees and Assignors, wherein they warranted that GranuFlo was merchantable and fit for the ordinary purposes for which it was intended.

279.    Patients, including the Enrollees, were intended direct or third-party beneficiaries of the warranty.

280.    GranuFlo was not merchantable and fit for its ordinary purpose because it had an unacceptable propensity to lead to the serious injuries as described herein.

281.    The Enrollees and Assignors reasonably relied on Defendants' representations that GranuFlo was safe and free of defects.

282.    Defendants' breach of the implied warranty of merchantability was the direct and proximate cause of the Enrollees' and Assignors' injuries.

283.    Defendants' conduct, as described above, was extreme and outrageous.

284.    Defendants risked the lives of the patients and users of their products with knowledge of the safety problems and suppressed this knowledge from the general public through their marketing and advertising, as well as other means.  Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public.  Defendants' outrageous conduct was wanton and willful.

**COUNT FIVE**
***Breach of Implied Warranty of Merchantability***

285.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs in the complaint as though fully set forth herein.

286.    Defendants manufactured, marketed, supplied, and sold GranuFlo with an implied warranty that it was fit for the particular purpose of being a safe dialysis chemical.

287.    Patients, including the Enrollees, were the intended direct or third-party beneficiaries of the warranty.

288.    GranuFlo was not fit for the particular purpose of being a safe dialysis chemical since it presents a serious risk of personal injury, which risk is much higher than other dialysis chemicals.

289.    The Enrollees reasonably relied on Defendants' representations that GranuFlo was safe and effective for dialysis.

290.    Defendants' breach of the implied warranty of fitness for a particular purpose was the direct and proximate cause of the Enrollees' injuries.

291.    Defendants' conduct, as described above, was extreme and outrageous.

292.    Defendants risked the lives of the patients and users of their products with knowledge of the safety problems and suppressed this knowledge from the general public through their marketing and advertising, as well as other means.  Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public.  Defendants' outrageous conduct was wanton and willful.

## COUNT SIX
### *Negligent Failure to Warn*

293.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs in the complaint as though fully set forth herein.

294.    Before the Enrollees used GranuFlo, and during the period that Enrollees used GranuFlo, Defendants knew or had reason to know that GranuFlo was dangerous and created an unreasonable risk of bodily harm to patients.

295.    Defendants had a duty to exercise reasonable care to warn patients, including Enrollees, of the dangerous conditions and circumstances that could lead to serious injury or death from using GranuFlo.

296.    Despite the fact that Defendants knew or had reason to know that GranuFlo was dangerous, Defendants failed to exercise reasonable care in warning the medical community, the public, and patients, such as Enrollees, of the dangerous conditions, circumstances and facts that could lead to serious injury or death from using GranuFlo.

297. Enrollees' injuries were the direct and proximate result of Defendants' failure to warn of the dangers of GranuFlo.

298. Defendants' conduct, as described above, was extreme and outrageous.

299. Defendants risked the lives of the patients and users of their products with knowledge of the safety problems and suppressed this knowledge from the general public through their marketing and advertising, as well as other means. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct was wanton and willful.

**COUNT SEVEN**
*Negligent Design Defect*

300. Plaintiffs reallege and incorporate by reference the foregoing paragraphs in the complaint as though fully set forth herein.

301. Defendants are the manufacturers, sellers, distributors, marketers, and suppliers of GranuFlo, which was negligently designed.

302. Defendants failed to exercise reasonable care in designing, developing, formulating, manufacturing, inspecting, testing, packaging, selling, distributing, labeling, marketing, and promoting GranuFlo, which is defective and presented an unreasonable risk of harm to patients, including Enrollees.

303. As a result, GranuFlo contains defects in design, which renders it dangerous to patients, including Enrollees, when used as intended or as reasonably foreseeable to Defendants. The design defects render GranuFlo more dangerous than other dialysis chemicals, and cause an unreasonable increased risk of injury, including but not limited to CP Arrest, sudden cardiac death, and other adverse cardiac events.

304.    Enrollees used GranuFlo in a reasonably foreseeable manner, and substantially as intended by Defendants.

305.    The subject GranuFlo was not materially altered or modified after manufacture by Defendants, and before used by Enrollees.

306.    The design defects directly rendered the subject GranuFlo defective and were the direct and proximate result of Defendants' negligent and failure to use reasonable care in designing, testing, and manufacturing GranuFlo.

307.    As a direct and proximate result of Defendants' negligent design of GranuFlo, Enrollees were injured and suffered injuries.

308.    Despite the fact that Defendants knew or should have known that GranuFlo was defectively designed, contained design defects, and caused an unreasonable risk of harm, Defendants designed, manufactured, sold, distributed, and marketed GranuFlo to patients, including the medical community and Enrollees, and failed to warn patients, the medical community, and Enrollees of the increased risk of harm relative to other dialysis chemicals.

309.    Defendants' conduct, as described above, was extreme and outrageous.

310.    Defendants risked the lives of the patients and users of their products with knowledge of the safety problems and suppressed this knowledge from the general public through their marketing and advertising, as well as other means.  Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public.  Defendants' outrageous conduct was wanton and willful.

## COUNT EIGHT
### *Negligent Misrepresentation*

311.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs in the complaint as though fully set forth herein.

312.    Prior to Enrollees' first dose of GranuFlo and during the period in which Enrollees used GranuFlo, Defendants misrepresented the degree to which GranuFlo was a safe and effective means for dialysis.

313.    Defendants also failed to disclose material facts regarding the safety and efficacy of GranuFlo, including information regarding increased adverse events and harmful side-effects.

314.    Defendants had a duty to provide Enrollees, physicians, and other patients with true and accurate information and warnings of any known risks and side-effects associated with the GranuFlo products they marketed, distributed, and sold.

315.    Defendants knew or should have known, based on prior experience, adverse event reports, studies, and knowledge of the efficacy and safety failures associated with GranuFlo that their representations regarding these drugs were false, and that they had a duty to disclose the dangers of GranuFlo.

316.    Defendants made the representations, and otherwise failed to disclose material facts concerning GranuFlo with the intent to induce patients, including Enrollees, to act in reliance thereon in receiving and/or using GranuFlo in dialysis treatment.

317.    Enrollees justifiably relied on Defendants' representations and non-disclosures by choosing to receive and/or use GranuFlo in dialysis treatment.

318.    Defendants' misrepresentations and omissions regarding the safety and efficacy of GranuFlo were the direct and proximate cause of Enrollees' injuries.

319.    Defendants' conduct, as described herein, was extreme and outrageous.

320.    Defendants risked the lives of the patients and users of their products with knowledge of the safety problems and suppressed this knowledge from the general public through their marketing and advertising, as well as other means.  Defendants made conscious decisions not

to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct was wanton and willful.

## COUNT NINE
### *Breach of Express Warranty*

321.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs in the complaint as though fully set forth herein.

322.    Defendants expressly warranted that GranuFlo was safe and effective to members of the consuming public, including Enrollees.

323.    Members of the consuming public, including patients such as Enrollees, were intended direct or third-party beneficiaries of the warranty.

324.    Defendants marketed, promoted, advertised, and sold GranuFlo as a safe product.

325.    GranuFlo does not conform to these express representations because it is not safe, and has serious side-effects, including serious personal injuries.

326.    Defendants breached their express warranty in one or more of the following ways:

a.    GranuFlo as designed, manufactured, promoted, distributed, marketed, sold and/or supplied by Defendants was defectively designed and placed in the stream of commerce by Defendants in a defective and unreasonably dangerous condition;

b.    Defendants failed to warn and/or place adequate warnings, labels, and instructions on GranuFlo;

c.    Defendants failed to adequately test GranuFlo; and

d.    Defendants failed to provide timely and adequate post-marketing warnings and instructions after they knew the risk of injury from GranuFlo.

327. The Assignors and/or Enrollees reasonably relied upon Defendants' warranty that GranuFlo was safe and effective when they paid for, received and/or used GranuFlo in dialysis treatment.

328. Enrollees' injuries were the direct and proximate result of Defendants' breach of their express warranty.

329. Defendants' conduct, as described herein, was extreme and outrageous.

330. Defendants risked the lives of the patients and users of their products with knowledge of the safety problems and suppressed this knowledge from the general public through their marketing and advertising, as well as other means. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct was wanton and willful.

## COUNT TEN
### *Violation of Consumer Protection laws*

331. Plaintiffs reallege and incorporate by reference the foregoing paragraphs in the complaint as though fully set forth herein.

332. Enrollees were administered GranuFlo during dialysis primarily for personal use and, thereby, suffered ascertainable losses as a result of Defendants' actions in violation of consumer protection laws.

333. Unfair methods of competition or deceptive acts or practices that were prescribed by law, include the following:

      a. representing that goods or services have characteristics, ingredients, user benefits, or quantified that they do not have;

      b. advertising goods or services with the intent not to sell them as advertised;

    c.   over-promotion of the GranuFlo products, including but not limited to over-promotion of its safety and efficacy; and

    d.   engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

334.    Defendants violated consumer protection laws through their use of false and misleading misrepresentations or omissions of material fact relating to the safety of GranuFlo.

335.    Defendants uniformly communicated the purported benefits of GranuFlo while failing to disclose the serious and dangerous side-effects related to the use of GranuFlo and of the true state of GranuFlo's regulatory status, its safety, its efficacy, and its usefulness. Defendants made these representations to physicians, the medical community at large, and to patients and consumers such as Plaintiffs in the marketing and advertising campaign described herein. Defendants' conduct in connection with GranuFlo was also impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because Defendants misleadingly, falsely and or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, costs, safety, efficacy and advantages of GranuFlo.

336.    Plaintiffs bring claims on behalf of violations for the following consumer protection statutes:

    a.   Connecticut – Conn. Gen. Stat. § 42-110b(a)

    b.   Massachusetts -- Mass. Gen. Laws Ann. 93A §§1-11 et. seq.

    c.   New York – N.Y. Gen. Bus. Law §§ 349 and 350

    a.   <u>Conn. Gen. Stat. § 42-110 *et. seq.*</u>

341.    Defendants are engaged in "trade or commerce" within the meaning of Conn. Gen. Stat. § 42-110a, during all relevant periods by, at a minimum, advertising, offering for sale, and

selling the affected products described herein in Connecticut, to Plaintiffs' Assignors and/or their Enrollees and throughout the United States.

342.    Connecticut Unfair Trade Practices ("CUTP") prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

343.    As detailed above, in the course of their business, Defendants engaged in unfair, unconscionable and deceptive acts or practices in violation of the above noted provisions by selling products it knew or should have known were unsafe and by failing to disclose to Plaintiffs Assignors' and/or its Enrollees regarding the true nature of the products.

344.    Defendants owed and continue to owe Plaintiffs, their Assignors, and/or their Enrollees a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Defendant's products and actions complained of herein.

345.    Defendants knew or should have known that their conduct was in violation of CUTP.

346.    Despite knowing the true nature of their products and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the Granuflo and/or Naturalyte products, with the intent to mislead regulators, Plaintiffs' Assignors and/or their Enrollees and continued to engage in unfair and deceptive practices in violation of CUTP.

347.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators, medical professionals, and reasonable consumers, including Plaintiffs' Assignors.

348.    Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay for the affected products when they otherwise would not have paid for the products.

349.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of providing payment for the defective Granuflo products described herein, further, Plaintiffs' Assignors were injured by way of paying for procedures and/or supplies they would not have had Defendants' products not been defective.

350.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

351.    Plaintiffs are entitled to recover their actual damages and attorneys' fees under Conn. Gen. Stat. § 42-110g.

352.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under CUPT.

### b. Mass. Gen. Laws. Ann. 93A

353.    Defendants are engaged in "trade or commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b) during all relevant periods by, at a minimum, advertising, offering for sale, and selling the affected products described herein in Massachusetts, to Plaintiffs' Assignors and/or their Enrollees and throughout the United States.

354.    Massachusetts Consumer Protection Act ("MCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Mass. Gen. Laws ch. 93A, § 2(a).

355.     As detailed above, in the course of their business, Defendants engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of MCPA by selling products it knew or should have known were unsafe and by failing to disclose to Plaintiffs Assignors' and/or its Enrollees regarding the true nature of the products.

356.     Defendants owed and continue to owe Plaintiffs', their Assignors, and/or their Enrollees a duty to refrain from the above-described unfair and deceptive practices and disclose the true nature of the Defendant's products and actions complained of herein.

357.     Defendants knew or should have known that their conduct was in violation of MCPA.

358.     Despite knowing the true nature of their products and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the GranuFlo products, with the intent to mislead regulators, Plaintiffs' Assignors and/or their Enrollees and continued to engage in unfair and deceptive practices in violation of MCPA.

359.     Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators and reasonable consumers, including Plaintiffs' Assignors.

360.     Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay for the defective Granuflo when they otherwise would not have paid for the products.

361.     Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of providing payment for the defective Granuflo products described herein, further, Plaintiffs' Assignors were injured by way of paying for procedures and/or supplies they would not have had Defendants' products not been defective.

362.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

363.    Plaintiffs are entitled to recover their actual damages and attorneys' fees under Mass. Gen. Laws Ch. 93A, § 9(3A).

364.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the MCPA.

### c. N.Y. Gen. Bus. Law § 349

365.    Defendants are and were engaged in "trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 349 during all relevant periods by, at a minimum, advertising, offering for sale, and selling the affected products described herein in New York to Plaintiffs' Assignors and/or their Enrollees and throughout the United States.

366.    N.Y. Gen. Bus. Law § 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service…"

367.    As detailed above, in the course of their business, Defendants engaged in unfair, unconscionable and deceptive acts or practices in violation of the above-noted provisions of N.Y. Gen. Bus. Law § 349 by selling products it knew or should have known were unsafe and by failing to disclose to Plaintiffs Assignors' and/or its Enrollees regarding the true nature of the products.

368.    Defendants owed and continue to owe Plaintiffs', their Assignors, and/or their Enrollees a duty to refrain from the above-described unfair and deceptive practices and disclose the tur nature of the Defendant's products and actions complained of herein.

369.    Defendants knew or should have known that their conduct was in violation of N.Y. Gen. Bus. Law § 349.

370.    Despite knowing the true nature of their products and practices for years, Defendants intentionally and/or knowingly omitted and/or misrepresented material facts regarding the GranuFlo products, with the intent to mislead regulators, Plaintiffs' Assignors and/or their Enrollees, and continued to engage in unfair and deceptive practices in violation of N.Y. Gen. Bus. Law § 349.

371.    Defendants' unfair and deceptive acts or practices, omissions and misrepresentations were material to Plaintiffs' Assignors and were likely to and/or did, in fact, deceive regulators, medical professionals and reasonable consumers, including Plaintiffs' Assignors.

372.    Defendants' material misrepresentations proximately caused Plaintiffs' Assignors to pay for the affected products when they otherwise would not have paid for the products.

373.    Plaintiffs suffered injury-in-fact, ascertainable loss and actual damages as a direct and proximate result of Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of providing payment for the defective Granuflo and/or Naturalyte products described herein, further, Plaintiffs' Assignors were injured by way of paying for procedures and/or supplies they would not have had Defendants' products not been defective.

374.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. As such, Defendants' unlawful acts and practices complained of herein affect the public interest.

375. Plaintiffs are entitled to recover their actual damages and attorneys' fees under N.Y. Gen. Bus. Law § 349(h).

376. Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

377. As a result of these violations of consumer protection laws, Plaintiffs have incurred serious physical injury, pain, suffering, loss of income, loss of opportunity, loss of family and social relationships, and medical, hospital and surgical expenses and other expense related to the diagnosis and treatment thereof, for which Defendants are liable.

### COUNT ELEVEN
### *Breach of Implied Warranty of Fitness for a Particular Purpose*

378. Plaintiffs reallege and incorporate by reference the foregoing paragraphs in the complaint as though fully set forth herein.

379. Defendants manufactured, marketed, supplied, and sold GranuFlo with an implied warranty that it was fit for the particular purpose of being a safe dialysis chemical.

380. Patients, including Enrollees, were the intended direct or third-party beneficiaries of the warranty.

381. GranuFlo was not fit for the particular purpose of being a safe dialysis chemical since it presents a serious risk of personal injury, which risk is much higher than other dialysis chemicals.

382. Enrollees reasonably relied on Defendants' representations that GranuFlo was safe and effective for dialysis.

383. Defendants' breach of the implied warranty of fitness for a particular purpose was the direct and proximate cause of Enrollees' injuries.

384.    Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the patients and users of their products with knowledge of the safety problems and suppressed this knowledge from the general public through their marketing and advertising, as well as other means. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct, which was wanton and willful, warrants an award of punitive damages.

## COUNT TWELVE
### *Fraud*

385.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs in the complaint as though fully set forth herein.

386.    Prior to the Enrollees' use of GranuFlo and during the period in which Enrollees used GranuFlo, Defendants fraudulently suppressed material information regarding the safety and efficacy of these chemicals, including information regarding serious personal injuries and death. Furthermore, Defendants fraudulently concealed the safety information about the use of GranuFlo. As described above, GranuFlo has several well-known serious side-effects that are not seen in other forms of dialysis chemicals. Plaintiffs, and the Assignors believe the fraudulent misrepresentations described herein were intended to maintain and increase the sales volume of GranuFlo.

387.    Defendants fraudulently concealed the safety issues associated with GranuFlo in order to induce physicians to recommend its use to Enrollees.

388.    At the time Defendants concealed the facts that GranuFlo were not safe, Defendants were under a duty to communicate this information to Plaintiffs, Enrollees, Assignors, physicians, the FDA, the medical community, and the general public in such a manner so that each group could appreciate the risks associated with using GranuFlo.

389. Defendants, at all times relevant hereto, withheld information from the FDA that they were required to report.

390. Plaintiffs' Assignors and prescribing physicians relied upon the Defendants' outrageous untruths regarding the safety of GranuFlo.

391. Plaintiffs' Assignors, and/or their Enrollees and/or their physicians were not provided with the necessary information by Defendants.

392. GranuFlo was improperly marketed to Plaintiffs and/or their physicians as the Defendants did not provide proper instructions about how to GranuFlo and did not adequately warn about GranuFlo's risks.

393. As a direct and proximate result of Defendants' malicious and intentional concealment of material life-altering information from Enrollees and/or Enrollees' physicians, Defendants caused or contributed to Plaintiffs' injuries.

394. It is unconscionable and outrageous that Defendants would risk the lives of patients, including Plaintiffs. Nevertheless, Defendants made conscious decisions not to redesign, label, warn or inform the unsuspecting consuming public about the dangers associated with the use of GranuFlo. Defendants' outrageous conduct, which was wanton and willful, rises to the level necessary that Plaintiffs should be awarded punitive damages to deter Defendants from this type of outrageous conduct in the future and to discourage Defendants from placing profits above the safety of patients in the United States of America.

395. Defendants widely advertised and promoted GranuFlo as safe and effective and/or as safe and effective for dialysis.

396. Defendants had a duty to disclose material information about serious side-effects to patients such as Enrollees.

397.    Additionally, by virtue of Defendants' partial disclosures about these medications, which Defendants touted GranuFlo as a safe and effective product, Defendants had a duty to disclose all facts about the risks associated with use of GranuFlo, including the risks described in this complaint. Defendants intentionally failed to fully disclose this information for the purpose of inducing physicians to prescribe and patients, such as Plaintiffs, to receive and/or use GranuFlo in dialysis treatment.

398.    Had Enrollees been aware of the hazards associated with GranuFlo, Plaintiffs would not have used GranuFlo, which led proximately to Plaintiffs' injuries.

399.    Defendants' advertisements regarding GranuFlo made material misrepresentations to the effect that GranuFlo were entirely safe, misrepresentations Defendants knew to be false, for the purpose of fraudulently inducing physicians to prescribe, patients, such as Enrollees to be administered, and insurers such as Assignors to pay for GranuFlo in dialysis treatment. Enrollees and Assignors relied on these material misrepresentations when deciding to be administered and/or pay for GranuFlo in dialysis treatment.

400.    Upon information and belief, the Assignors aver that Defendants actively and fraudulently concealed information in Defendants' exclusive possession regarding the hazards associated with GranuFlo with the purpose of preventing physicians, patients, and insurers, including the Assignors and their Enrollees, from discovering these hazards.

## JURY TRIAL DEMAND

401.    Plaintiffs, through undersigned counsel, demand a trial by jury on all issues triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment against Defendants, and each of them, individually, jointly and severally and requests compensatory damages, punitive damages,

together with interest, cost of suit, attorneys' fees, and all such other relief as the Court deems just

and proper.

DATED: March 11, 2019.

THE FERRARO LAW FIRM, P.A.
*Attorneys for Plaintiffs*
600 Brickell Avenue, Suite 3800
Miami, Florida 33131
Telephone: (305) 375-0111
Facsimile: (305) 379-6222

*/s/ David Jagolinzer*
DAVID A. JAGOLINZER, ESQ. BBO
No.: 643971

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document filed

through the ECF system will be sent electronically to the registered participants as identified on

the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-

registered participants, this 11th day of March, 2019.

*/s/ David Jagolinzer*
DAVID A. JAGOLINZER, ESQ. BBO
No.: 643971

## SERVICE LIST

William H. Kettlewell (BBO# 270320)
Maria R. Durant (BBO# 558906)
**HOGAN LOVELLS US LLP**
100 High Street, 20th Floor
Boston, MA 02110
Tel: (617) 371-1000
Fax: (617) 671-1037
wkettlewell@hoganlovells.com
mdurant@hoganlovells.com
James F. Bennett (*pro hac vice*)
Megan S. Heinsz (*pro hac vice*)

**DOWD BENNET LLP**
773 Forsyth Blvd., Suite 1410
St. Louis, MO 63105
Tel: (314) 889-7300
Fax: (314) 889-7302
jbennett@dowdbennett.com
mheinsz@dowdbennett.com

Leigh Anne Hodge
**BRADLEY ARANT BOULT CUMMINGS LLP**
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Tel: (205) 521-8000
Fax: (205) 521-8800
lhodge@babc.com

## APPENDIX

**Plaintiff MSPRC's Standing**

A1.      On December 15, 2015, **Alianza Profesional de Cuidado Medico Inc.** ("APCM") irrevocably assigned all its rights and claims to recover against any liable entity (including defendants) for payments made on behalf of their enrollees under Medicare Parts A, B, and D to MSP Recovery 15-627, LLC. Specifically, the APCM Assignment, attached as Composite Exhibit G, states the following:

> [APCM] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, in perpetuity, any and all of [APCM's] right, title, ownership and interest in and to all rights and entitlements, and all information and data used to pursue and/or recover monies for [APCM] that [APCM] has, may have had, or has asserted against any party including, but not limited to, primary payors and/or third parties that may be liable to [APCM] arising from or relating to the Assigned Claims.

Comp. Ex. G, at 1.1. Consideration was given between each party in executing these assignments.

A2.      On June 12, 2017, MSP Recovery 15-627, LLC irrevocably assigned all rights acquired under the APCM Assignment to Series 15-12-404, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Health Care Claim(s) Cost Recovery Agreement dated December 10, 2015, by and among [APCM] and [MSP Recovery 15-627, LLC] . . .

Comp. Ex. G.  Consideration was given between each party in executing these assignments.

A3.      On December 16, 2015, **Arse, Inc.** ("ARSE") irrevocably assigned all its rights and claims to recover against any liable entity (including defendants) for payments made on behalf of their enrollees under Medicare Parts A, B, and D to MSP Recovery, LLC ("MSP Recovery"). Specifically, the ARSE Assignment attached as Composite Exhibit H, states the following:

> [ARSE] hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of [ARSE's] right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for [ARSE] that [ARSE] has, may have had, or has asserted against any party ("Assigned Claims"). This includes, but is not limited to, primary payors and/or third parties that may be liable to [ARSE] arising from or relating to the Assigned Claims.

Comp. Ex. H, at 4.1. Consideration was given between each party in executing these assignments.

A4.     On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under the ASRI

Assignment to Series 15-12-406, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Health Care Claim(s) Cost Recovery Agreement dated December 16, 2015, by and among [ASRI] and [MSP Recovery, LLC] . . .

Comp. Ex. H.

A5.     On March 1, 2016, **Asomante Medical Group, Inc.** ("AMGP") irrevocably assigned all its rights and claims to recover against any liable entity (including defendants) for payments made on behalf of their enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the AMGP Assignment attached as Composite Exhibit I, states the following:

> [AMGP] hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of [AMGP's] right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for [AMGP] that [AMGP] has, may have had, or has asserted against any party ("Assigned Claims"). This includes, but is not limited to, primary payors and/or third parties that may be liable to [AMGP] arising from or relating to the Assigned Claims.

Comp. Ex. I, at 4.1. Consideration was given between each party in executing these assignments.

A6.     On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under the AMGP

Assignment to Series 16-03-444, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title,

> ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated March 1, 2016, by and among [AMGP] and [MSP Recovery, LLC] . . .

Comp. Ex. I. Consideration was given between each party in executing these assignments.

A7.     On February 18, 2016, **Broward Primary Partners, LLC,** ("BPPL") irrevocably assigned all its rights and claims to recover against any liable entity (including defendants) for payments made on behalf of their enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the BPPL Assignment attached as Composite Exhibit J, states the following:

> [BPPL] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, in perpetuity, any and all of [BPPL's] right, title, ownership and interest in and to all rights and entitlements, and all information and data used to pursue and/or recover monies for [BPPL] that [BPPL] has, may have had, or has asserted against any party including, but not limited to, primary payors and/or third parties that may be liable to [BPPL] arising from or relating to the Assigned Claims.

Comp. Ex. J, at 1.1. Consideration was given between each party in executing these assignments.

A8.     On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under the BPPL Assignment to Series 16-02-437, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Claim(s) Cost Recovery Agreement and Assignment of Claims and Causes of Action dated February 18, 2016, by and among [BPPL] and [MSP Recovery, LLC] . . .

Comp. Ex. J. Consideration was given between each party in executing these assignments.

A9.     On February 22, 2016, **Centro Medico Salinas, Inc.** ("CMDS") irrevocably assigned all its rights and claims to recover against any liable entity (including defendants) for payments made on behalf of their enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the CMDS Assignment attached as Composite Exhibit K, states the following:

> [CMDS] hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of [CMDS's] right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for [CMDS] that [CMDS] has, may have had, or has asserted against any party ("Assigned Claims"). This includes, but is not limited to, primary payors and/or third parties that may be liable to [CMDS] arising from or relating to the Assigned Claims.

Comp. Ex. K, at 4.1. Consideration was given between each party in executing these assignments.

A10.   On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under the CMDS

Assignment to Series 16-02-438, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated February 22, 2016, by and among [CMDS] and [MSP Recovery, LLC] . . .

Comp. Ex. K. Consideration was given between each party in executing these assignments.

A11.   On March 20, 2018, **Connecticare, Inc.** ("Connecticare") irrevocably assigned all its rights

and claims to recover against any liable entity (including defendants) for payments made on behalf

of its enrollees under Medicare Parts A, B, and D to Series 15-09-157, a designated series of

Plaintiff MSPRC. Specifically, the assignment, attached as Exhibit L, states the following:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all [claims against third parties], whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the [claims] and all rights and claims against primary payers and/or . . . third parties that may be liable to Assignor arising from or relating to the [claims], including claims under consumer protection statutes and laws, and all information relating thereto, as may be applicable.

Ex. L, at 2. Consideration was given between each party in executing these assignments.

A12.   On December 16, 2015, **Corporacion Medica Oriental** ("CMOC") irrevocably assigned

all its rights and claims to recover against any liable entity (including defendants) for payments

made on behalf of their enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically,

the CMOC Assignment attached as Composite Exhibit M, states the following:

> [CMOC] hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of [CMOC's] right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for [CMOC] that [CMOC] has, may have had, or has asserted against any party ("Assigned Claims"). This includes, but is not limited to, primary payors and/or third parties that may be liable to [CMOC] arising from or relating to the Assigned Claims.

Comp. Ex. M, at 4.1. Consideration was given between each party in executing these assignments.

A13.    On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under the CMOC

Assignment to Series 15-12-407, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated December 16, 2015, by and among [CMOC] and [MSP Recovery, LLC] . . .

Comp. Ex. M. Consideration was given between each party in executing these assignments.

A14.    On March 31, 2016, **Corporacion Puertorriquena De Salud** ("CPDS") irrevocably

assigned all its rights and claims to recover against any liable entity (including defendants) for

payments made on behalf of their enrollees under Medicare Parts A, B, and D to MSP Recovery.

Specifically, the CPDS Assignment attached as Composite Exhibit N, states the following:

> [CPDS] hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of [CPDS's] right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for [CPDS] that [CPDS] has, may have had, or has asserted against any party ("Assigned Claims"). This includes, but is not limited to, primary payors and/or third parties that may be liable to [CPDA] arising from or relating to the Assigned Claims.

Comp. Ex. N, at 4.1. Consideration was given between each party in executing these assignments.

On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under the CPDS

Assignment to Series 16-04-448, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to
> Assignee and its successors and assigns, any and all of Assignor's rights, title,
> ownership and interest in and to the [claims] (and all proceeds and products thereof)
> as such terms are defined in the Recovery Agreement dated March 31, 2016, by
> and among [CPDS] and [MSP Recovery, LLC] . . .

Comp. Ex. N. Consideration was given between each party in executing these assignments.

A15.    On June 19, 2017, **Fallon Community Health** ("FCHP") irrevocably assigned all its rights

and claims to recover against any liable entity (including defendants) for payments made on behalf

of their enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the FCHP

Assignment attached as Composite Exhibit O, states the following:

> [FCHP] hereby irrevocably assigns, transfers, conveys, sets over and delivers to
> MSP Recovery, and any of its successors and assigns, any and all of [FCHP's] right,
> title, ownership and interest in and to all Claims existing on the date hereof, whether
> based in contract, tort, statutory right, and any and all rights (including, but not
> limited to, subrogation) to pursue and/or recover monies for [FCHP] that [FCHP]
> had, may have had, or has asserted against any party in connection with Claims and
> all rights and claims against primary payers and/or third parties that may be liable
> to [FCHP] arising from or relating to the Claims, including claims under consumer
> protection statutes and laws, and all information relating thereto, all of which shall
> constitute the "Assigned Claims."

Comp. Ex. O, at 4.1. Consideration was given between each party in executing these

assignments.

On June 20, 2017, MSP Recovery irrevocably assigned all rights acquired under the FCHP

Assignment to Series 17-04-631, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to
> Assignee and its successors and assigns, any and all of Assignor's rights, title,
> ownership and interest in and to the [claims] (and all proceeds and products thereof)
> as such terms are defined in the Recovery Agreement dated June 19, 2017, by and
> among [FCHP] and [MSP Recovery, LLC] . . .

Comp. Ex. O.  Consideration was given between each party in executing these assignments.

A16.   On October 6, 2017, **Family Physicians Group** ("FPGI") **a dba of Family Physicians of Winter Partk. P.A.,** irrevocably assigned all its rights and claims to recover against any liable entity (including defendants) for payments made on behalf of their enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the FPGI Assignment attached as Composite Exhibit P, states the following:

> [FPGI] hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [FPGI's] right, title, ownership and interest in and to those Claims transferred to MSP Recovery for Claims' analysis and recovery pursuit on the date of transferring said claims, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [FPGI] that [FPGI] had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to [FPGI] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims."

Comp. Ex. P, at 4.1.  Consideration was given between each party in executing these assignments.

On October 10, 2017, MSP Recovery irrevocably assigned all rights acquired under the FPGI Assignment to Series 17-05-634, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated October 6, 2017, by and among [FPGI] and [MSP Recovery, LLC] . . .

Comp. Ex. P.  Consideration was given between each party in executing these assignments.

A17.   On March 20, 2018, **Group Health Incorporated and Health Insurance Plan of Greater New York** (otherwise known as "EmblemHealth" or "Emblem") irrevocably assigned all its rights and claims to recover against any liable entity (including defendants) for payments made on behalf of their enrollees under Medicare Parts A, B, and D to Series 16-08-483, a designated series of

Plaintiff MSPRC. Specifically, the Emblem Assignments, attached as Composite Exhibit Q, state

the following:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to
> Assignee, and any of its successors and assigns, any and all of Assignor's right,
> title, ownership and interest in and to all [claims against third parties], whether
> based in contract, tort, statutory right, and any and all rights (including, but not
> limited to, subrogation) to pursue and/or recover monies that Assignor had, may
> have had, or has asserted against any party in connection with the [claims] and all
> rights and claims against primary payers and/or . . . third parties that may be liable
> to Assignor arising from or relating to the [claims], including claims under
> consumer protection statutes and laws, and all information relating thereto, as may
> be applicable . . .

Comp. Ex. Q., at 2.4. Consideration was given between each party in executing these assignments.

A18.    On December 10, 2015, **Grupo Cuidado Geriatrico Integral** ("GCMMI") irrevocably

assigned all its rights and claims to recovery against any liable entity (including defendants for

payments made on behalf of its Enrollees under Medicare Parts A, B, and D to MSP Recovery 15-

626, LLC. Specifically, the GCMMI Assignment, attached as Composite Exhibit R, states the

following:

> [GCMMI] hereby irrevocably assigns, transfers, conveys, sets over and delivers to
> MSP Recovery, or its assigns, in perpetuity, any and all of [GCMMI's] right, title,
> ownership and interest in and to all rights and entitlements, and all information and
> data used to pursue and/or recover monies for [GCMMI] that [GCMMI] has, may
> have had, or has asserted against any party including, but not limited to, primary
> payors and/or third parties that may be liable to [GCMMI] arising from or relating
> to the Assigned Claims.

Comp. Ex. R, at 1.1. Consideration was given between each party in executing these assignments.

On June 12, 2017, MSP Recovery 15-626, LLC, irrevocably assigned all rights acquired

under the GCMMI Assignment to Series 15-12-403, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to
> Assignee and its successors and assigns, any and all of Assignor's rights, title,
> ownership and interest in and to the [claims] (and all proceeds and products thereof)
> as such terms are defined in the Health Care Claim(s) Cost Recovery Agreement

dated December 10, 2015, by and among [GCMMI] and [MSP Recovery 15-6236, LLC] . . .

Comp. Ex. R.  Consideration was given between each party in executing these assignments.

A19.   On August 28, 2015, **Health Care Advisor Services, Inc.** ("HCAS") irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants for payments made on behalf of its Enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the HCAS Assignment, attached as Composite Exhibit S, states the following:

> [HCAS] hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of [HCAS's] right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for [HCAS] that [HCAS] has, may have had, or has asserted against any party ("Assigned Claims"). This includes, but is not limited to, primary payors and/or third parties that may be liable to [HCAS] arising from or relating to the Assigned Claims.

Comp. Ex. S, at 4.1. Consideration was given between each party in executing these assignments.

A20.   On June 12, 2017, MSP Recovery, irrevocably assigned all rights acquired under the HCAS Assignment to Series 15-08-27, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated August 28, 2015, by and among [HCAS] and [MSP Recovery, LLC] . . .

Comp. Ex. S. Consideration was given between each party in executing these assignments.

A21.   On April 28, 2016, **Health First Health Plans, Inc.,** through its administrator **Health First Administrative Plans, Inc.** ("HFAP") irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants for payments made on behalf of its Enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the HFAP Assignment, attached as Composite Exhibit T, states the following:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims."

Comp. Ex. T, at 4.1. Consideration was given between each party in executing these assignments.

On June 12, 2017, MSP Recovery, irrevocably assigned all rights acquired under the HFAP

Assignment to Series 16-05-456, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated April 28, 2016, by and among [HFAP] and [MSP Recovery, LLC] . . .

Comp. Ex. T. Consideration was given between each party in executing these assignments.

A22.   On September 14, 2015, **Hygea Health Holdings, Inc.** ("HYG") irrevocably assigned all

its rights and claims to recovery against any liable entity (including defendants for payments made

on behalf of its Enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the

HYG Assignment, attached as Composite Exhibit U, states the following:

> [HYG] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, in perpetuity, any and all of [HYG's] right, title, ownership and interest in and to all rights and entitlements, and all information and data used to pursue and/or recover monies for [HYG] that [HYG] has, may have had, or has asserted against any party including, but not limited to, primary payors and/or third parties that may be liable to [HYG] arising from or relating to the Assigned Claims.

Comp. Ex. U, at 1.1. Consideration was given between each party in executing these assignments.

On June 12, 2017, MSP Recovery, irrevocably assigned all rights acquired under the HYG

Assignment to Series 15-08-19, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Health Care Claims Cost Recovery Agreement dated September 14, 2015, by and among [HYG] and [MSP Recovery, LLC] . . .

Comp. Ex. U. Consideration was given between each party in executing these assignments.

A23.    On August 17, 2017, **Medical Consultants Management, LLC** ("MCML") irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants for payments made on behalf of its Enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the MCML Assignment, attached as Composite Exhibit V, states the following:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims."

Comp. Ex. V, at 4.1. Consideration was given between each party in executing these assignments.

On September 8, 2017, MSP Recovery, irrevocably assigned all rights acquired under the MCML Assignment to Series 17-08-647, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Health Care Claims Cost Recovery Agreement dated August 17, 2017, by and among [MCML] and [MSP Recovery, LLC] . . .

Comp. Ex. V. Consideration was given between each party in executing these assignments.

A24.    On February 18, 2016 **Medical IPA of the Palm Beaches, Inc.** ("MIPAPB") irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants for

payments made on behalf of its Enrollees under Medicare Parts A, B, and D to MSP Recovery.

Specifically, the MIPAPB Assignment, attached as Composite Exhibit W, states the following:

> [MIPAPB] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, in perpetuity, any and all of [MIPAPB's] right, title, ownership and interest in and to all rights and entitlements, and all information and data used to pursue and/or recover monies for [MIPAPB] that [MIPAPB] has, may have had, or has asserted against any party including, but not limited to, primary payors and/or third parties that may be liable to [MIPAPB] arising from or relating to the Assigned Claims.

Comp. Ex. W, at 1.1. Consideration was given between each party in executing these assignments.

On June 12, 2017, MSP Recovery, irrevocably assigned all rights acquired under the

MIPAPB Assignment to Series 16-02-436, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Claim(s) Cost Recovery Agreement and Assignment of Claims and Causes of Action dated February 18, 2016, by and among [MIPAPB] and [MSP Recovery, LLC] . . .

Comp. Ex. W. Consideration was given between each party in executing these assignments.

A25.   On August 9, 2017, **Network Health, Inc.** ("NHPN") irrevocably assigned all its rights

and claims to recovery against any liable entity (including defendants for payments made on behalf

of its Enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the NHPN

Assignment, attached as Composite Exhibit X, states the following:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims."

Comp. Ex. X, at 4.1. Consideration was given between each party in executing these assignments.

On August 10, 2017, MSP Recovery, irrevocably assigned all rights acquired under the

NHPN Assignment to Series 15-09-355, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to
> Assignee and its successors and assigns, any and all of Assignor's rights, title,
> ownership and interest in and to the [claims] (and all proceeds and products thereof)
> as such terms are defined in the Recovery Agreement dated August 9, 2017, by and
> among [MIPAPB] and [MSP Recovery, LLC] . . .

Comp. Ex. X. Consideration was given between each party in executing these assignments.

A26.   On December 23, 2015, **Palm Beach Primary Care Associations, Inc.** ("PBPCA")

irrevocably assigned all its rights and claims to recovery against any liable entity (including

defendants for payments made on behalf of its Enrollees under Medicare Parts A, B, and D to MSP

Recovery 16-1, LLC. Specifically, the PBPCA Assignment, attached as Composite Exhibit Y,

states the following:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP
> Recovery, or its assigns, in perpetuity, any and all of Client's right, title, ownership
> and interest in and to all rights and entitlements, and all information and data used
> to pursue and/or recover monies for Client that Client has, may have had, or has
> asserted against any party (the "Assigned Claims"). This includes, but is not limited
> to, primary payors and/or third parties that may be liable to Client arising from or
> relating to the Assigned Claims.

Comp. Ex. Y, at 1.1. Consideration was given between each party in executing these assignments.

On June 12, 2017, MSP Recovery 16-1, LLC, irrevocably assigned all rights acquired

under the PBPCA Assignment to Series 16-01-409, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to
> Assignee and its successors and assigns, any and all of Assignor's rights, title,
> ownership and interest in and to the [claims] (and all proceeds and products thereof)
> as such terms are defined in the Health Care Claim(s) Cost Recovery Agreement
> dated December 23, 2015,, by and among [PBPCA] and [MSP Recovery 16-1,
> LLC] . . .

Comp. Ex. Y. Consideration was given between each party in executing these assignments.

A27.    On October 29, 2015, **Physicians Access Urgent Care Group, LLC** ("PPP") irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants for payments made on behalf of its Enrollees under Medicare Parts A, B, and D to MSP Recovery 15-580, LLC. Specifically, the PPP Assignment, attached as Composite Exhibit Z, states the following:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, in perpetuity, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information and data used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party (the "Assigned Claims"). This includes, but is not limited to, primary payors and/or third parties that may be liable to Client arising from or relating to the Assigned Claims.

Comp. Ex. Z, at 1.1. Consideration was given between each party in executing these assignments.

On June 12, 2017, MSP Recovery 15-580, LLC, irrevocably assigned all rights acquired under the PPP Assignment to Series 15-10-362, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Health Care Claim(s) Cost Recovery Agreement dated October 29, 2015, by and among [PPP] and [MSP Recovery, 15-580, LLC] . . .

Comp. Ex. Z. Consideration was given between each party in executing these assignments.

A28.    On December 3, 2015, **Physician H.M.O. Inc.** ("PHMO") irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants for payments made on behalf of its Enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the PHMO Assignment, attached as Composite Exhibit AA, states the following:

> Client hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies

> for Client that Client has, may have had, or has asserted against any party
> ("Assigned Claims"). This includes, but is not limited to, primary payors and/or
> third parties that may be liable to Client arising from or relating to the Assigned
> Claims.

Comp. Ex. AA, at 4.1.  Consideration was given between each party in executing these
assignments.

On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under the PHMO
Assignment to Series 15-12-396, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to
> Assignee and its successors and assigns, any and all of Assignor's rights, title,
> ownership and interest in and to the [claims] (and all proceeds and products thereof)
> as such terms are defined in the Recovery Agreement dated December 3, 2015, by
> and among [PHMO] and [MSP Recovery, LLC] . . .

Comp. Ex. AA.  Consideration was given between each party in executing these assignments.

A29.   On April 16, 2016, **Ponce Advance Medical Group, P.S.C.,** ("PAMG") irrevocably
assigned all its rights and claims to recovery against any liable entity (including defendants for
payments made on behalf of its Enrollees under Medicare Parts A, B, and D to MSP Recovery.
Specifically, the PAMG Assignment, attached as Composite Exhibit BB, states the following:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP
> Recovery, and any of its successors and assigns, any and all of Client's right, title,
> ownership and interest in and to all Claims existing on the date hereof, whether
> based in contract, tort, statutory right, and any and all rights (including, but not
> limited to, subrogation) to pursue and/or recover monies for Client that Client had,
> may have had, or has asserted against any party in connection with the Claims and
> all rights and claims against primary payers and/or third parties that may be liable
> to Client arising from or relating to the Claims, including claims under consumer
> protection statutes and laws, and all information relating thereto, all of which shall
> constitute the "Assigned Claims."

Comp. Ex. BB, at 4.1.  Consideration was given between each party in executing these assignments.

A30.   On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under the PAMG
Assignment to Series 16-04-454, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated April 16, 2016, by and among [PAMG] and [MSP Recovery, LLC] . . .

Comp. Ex. BB. Consideration was given between each party in executing these assignments.

A31.   On February 18, 2016, **Preferred Primary Care, LLC** ("PPC") irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants for payments made on behalf of its Enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the PPC Assignment, attached as Composite Exhibit CC, states the following:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Claims, or its assigns, to the extent it is legally permitted any and all of Client's right, title, ownership and interest in and to all rights and entitlements, that Client has, may have had, or has asserted against any party including primary payors and/or third parties that may be liable to Client arising from or relating to the Assigned Claims.

Comp. Ex. CC, at 1.1.   Consideration was given between each party in executing these assignments.

On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under the PPC Assignment to Series 16-02-435, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Claim(s) Cost Recovery Agreement and Assignment of Claims and Causes of Action dated February 18, 2016, by and among [PPC] and [MSP Recovery, LLC] . . .

Comp. Ex. CC. Consideration was given between each party in executing these assignments.

A32.   On July 19, 2017, **Premier Care Partners, LLC** ("PCPS") irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants for payments made

on behalf of its Enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the

PCPS Assignment, attached as Composite Exhibit DD, states the following:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP
> Recovery, and any of its successors and assigns, any and all of Client's right, title,
> ownership and interest in and to all Claims existing on the date hereof, whether
> based in contract, tort, statutory right, and any and all rights (including, but not
> limited to, subrogation) to pursue and/or recover monies for Client that Client had,
> may have had, or has asserted against any party in connection with the Claims and
> all rights and claims against primary payers and/or third parties that may be liable
> to Client arising from or relating to the Claims, including claims under consumer
> protection statutes and laws, and all information relating thereto, all of which shall
> constitute the "Assigned Claims."

Comp. Ex. DD, at 4.1. Consideration was given between each party in executing these

assignments.

On July 20, 2017, MSP Recovery irrevocably assigned all rights acquired under the PCPS

Assignment to Series 17-07-642, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to
> Assignee and its successors and assigns, any and all of Assignor's rights, title,
> ownership and interest in and to the [claims] (and all proceeds and products thereof)
> as such terms are defined in the Recovery Agreement dated July 19, 2017, by and
> among [PCPS] and [MSP Recovery, LLC] . . .

Comp. Ex. DD. Consideration was given between each party in executing these assignments.

A33.    On January 15, 2016, **Primary Physicians Medical Service, LLC** ("PPMS") irrevocably

assigned all its rights and claims to recovery against any liable entity (including defendants for

payments made on behalf of its Enrollees under Medicare Parts A, B, and D to MSP Recovery.

Specifically, the PPMS Assignment, attached as Composite Exhibit EE, states the following:

> Client hereby assigns, transfers, conveys, sets over and delivers to MSP, or its
> assigns, any and all of Client's right, title, ownership and interest in and to all rights
> and entitlements, and all information and data used to pursue and/or recover monies
> for Client that Client has, may have had, or has asserted against any party (the
> "Assigned Claims"). This includes, but is not limited to, primary payors and/or third
> parties that may be liable to Client arising from or relating to the Assigned Claims.

Comp. Ex. EE, at 8. Consideration was given between each party in executing these assignments.

On July 20, 2017, MSP Recovery irrevocably assigned all rights acquired under the PPMS

Assignment to Series 16-01-413, LLC, a designated series of Plaintiff MSPRC:

> 201.    [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Health Care Claim(s) Cost Recovery Agreement dated January 15, 2016, by and among [PPMS] and [MSP Recovery, LLC] . . .

Comp. Ex. EE. Consideration was given between each party in executing these assignments.

A34.    On February 18, 2016, **Risk Watchers, Inc.** ("HPRW") irrevocably assigned all its rights

and claims to recovery against any liable entity (including defendants for payments made on behalf

of its Enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the HPRW

Assignment, attached as Composite Exhibit FF, states the following:

> Client hereby assigns, transfers, conveys, sets over and delivers to MSP Claims, or its assigns, to the extent it is legally permitted any and all of Client's right, title, ownership and interest in and to all rights and entitlements, that Client has, may have had, or has asserted against any party including primary payors and/or third parties that may be liable to Client arising from or relating to the Assigned Claims.

Comp. Ex. FF, at 1.1. Consideration was given between each party in executing these assignments.

On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under the HPRW

Assignment to Series 15-09-31, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Claim(s) Cost Recovery Agreement and Assignment of Claims and Causes of Action dated February 18, 2016, by and among [HPRW] and [MSP Recovery, LLC] . . .

Comp. Ex. FF. Consideration was given between each party in executing these assignments.

A35.    On May 12, 2017, **Summacare, Inc.** ("Summacare") irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants) for payments made on behalf of its enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the Summacare Assignment, attached as Composite Exhibit GG, states the following:

> [Summacare] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [Summacare's] right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [Summacare] that [Summacare] had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to [Summacare] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims".

Comp. Ex. GG, at 1.2. Consideration was given between each party in executing these assignments.

On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under the Summacare Assignment to Series 16-11-509, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the [claims](and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated May 12, 2017, by and among [Summacare] . . . and [MSP Recovery] . . .

Comp. Ex. GG. Consideration was given between each party in executing these assignments.

Summacare consented to, acknowledged, approved, and ratified the assignment from MSP Recovery to Series 16-11-509, which is memorialized in a letter dated September 5, 2018, and attached as Comp. Ex. GG.

A36.    On September 21, 2015, **Suncoast Medical Network 2, Inc.** ("SUNCM"), irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants) for payments made on behalf of its enrollees under Medicare Parts A, B, and D to MSP Recovery,

220, LLC. Specifically, the SUNCM Assignment, attached as Composite Exhibit HH, states the

following:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP
> Recovery, or its assigns, in perpetuity, any and all of Client's right, title, ownership
> and interest in and to all rights and entitlements, and all information and data used
> to pursue and/or recover monies for Client that Client has, may have had, or has
> asserted against any party (the "Assigned Claims"). This includes, but is not limited
> to, primary payors and/or third parties that may be liable to Client arising from or
> relating to the Assigned Claims.

Comp. Ex. II, at 1.1. Consideration was given between each party in executing these assignments.

On June 12, 2017, MSP Recovery 220, LLC, irrevocably assigned all rights acquired under

the SUNCM Assignment to Series 15-08-10, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to
> Assignee and its successors and assigns, any and all of Assignor's right, title,
> ownership and interest in and to the [claims](and all proceeds and products thereof)
> as such terms are defined in the Healthcare Claim(s) Cost Recovery Agreement
> dated September 21, 2015, by and among [SUNCM}. . . and [MSP Recovery 220,
> LLC] . . .

Comp. Ex. II. Consideration was given between each party in executing these assignments.

A37.    On November 9, 2015, **Suncoast Provider Network, Inc.** ("SCPN") irrevocably assigned

all its rights and claims to recovery against any liable entity (including defendants) for payments

made on behalf of its enrollees under Medicare Parts A, B, and D to MSP Recovery, 15-608, LLC.

Specifically, the SCPN Assignment, attached as Composite Exhibit II, states the following:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP
> Recovery, or its assigns, in perpetuity, any and all of Client's right, title, ownership
> and interest in and to all rights and entitlements, and all information and data used
> to pursue and/or recover monies for Client that Client has, may have had, or has
> asserted against any party (the "Assigned Claims"). This includes, but is not limited
> to, primary payors and/or third parties that may be liable to Client arising from or
> relating to the Assigned Claims.

Comp. Ex. JJ, at 1.1. Consideration was given between each party in executing these assignments.

On June 12, 2017, MSP Recovery 15-608, LLC, irrevocably assigned all rights acquired under the SCPN Assignment to Series 15-11-387, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the [claims](and all proceeds and products thereof) as such terms are defined in the Healthcare Claim(s) Cost Recovery Agreement dated November 9, 2015, by and among [SCPN]. . . and [MSP Recovery 15-608, LLC] . . .

Comp. Ex. JJ. Consideration was given between each party in executing these assignments.

A38.    On November 3, 2015, **Transatlantic Healthcare, Inc.** ("THC") irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants) for payments made on behalf of its enrollees under Medicare Parts A, B, and D to MSP Recovery, 15-131, LLC. Specifically, the THC Assignment, attached as Composite Exhibit JJ, states the following:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, in perpetuity, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information and data used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party (the "Assigned Claims"). This includes, but is not limited to, primary payors and/or third parties that may be liable to Client arising from or relating to the Assigned Claims.

Comp. Ex. KK, at 1.1. Consideration was given between each party in executing these assignments.

On June 12, 2017, MSP Recovery 15-131, LLC, irrevocably assigned all rights acquired under the THC Assignment to Series 15-11-385, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the [claims](and all proceeds and products thereof) as such terms are defined in the Healthcare Claim(s) Cost Recovery Agreement dated November 3, 2015, by and among [THC]. . . and [MSP Recovery 15-131, LLC] . . .

Comp. Ex. KK. Consideration was given between each party in executing these assignments.

A39.   On November 3, 2015, **Trinity Physicians, LLC** ("TPS") irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants) for payments made on behalf of its enrollees under Medicare Parts A, B, and D to MSP Recovery, 15-592, LLC. Specifically, the TPS Assignment, attached as Composite Exhibi tLL, states the following:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, in perpetuity, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information and data used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party (the "Assigned Claims"). This includes, but is not limited to, primary payors and/or third parties that may be liable to Client arising from or relating to the Assigned Claims.

Comp. Ex. LL, at 1.1.   Consideration was given between each party in executing these assignments.

On June 12, 2017, MSP Recovery 15-592, LLC, irrevocably assigned all rights acquired under the TPS Assignment to Series 15-11-371, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the [claims](and all proceeds and products thereof) as such terms are defined in the Healthcare Claim(s) Cost Recovery Agreement dated November 3, 2015, by and among [TPS]. . . and [MSP Recovery 15-592, LLC] . . .

Comp. Ex. LL. Consideration was given between each party in executing these assignments.

A40.   On November 23, 2015, **University Health Care MSO, Inc.** ("UNHC") irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants) for payments made on behalf of its enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the UNHC Assignment, attached as Composite Exhibit MM, states the following:

> Client hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims"). This includes, but is not limited to, primary payors and/or

> third parties that may be liable to Client arising from or relating to the Assigned
> Claims.

Comp. Ex. MM, at 1.1. Consideration was given between each party in executing these
assignments.

On June 12, 2017, MSP Recovery, irrevocably assigned all rights acquired under the

UNHC Assignment to Series 15-08-25, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to
> Assignee and its successors and assigns, any and all of Assignor's right, title,
> ownership and interest in and to the [claims](and all proceeds and products thereof)
> as such terms are defined in the Recovery Agreement dated November 23, 2015,
> by and among [UNHC]. . . and [MSP Recovery, LLC] . . .

Comp. Ex. MM. Consideration was given between each party in executing these assignments.

A41.   On April 7, 2016, **Verimed IPA, LLC** ("VMIL") irrevocably assigned all its rights and

claims to recovery against any liable entity (including defendants) for payments made on behalf

of its enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the VMIL

Assignment, attached as Composite Exhibit NN, states the following:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP
> Recovery, and any of its successors and assigns, any and all of Client's right, title,
> ownership and interest in and to all Claims existing on the date hereof, whether
> based in contract, tort, statutory right, and any and all rights (including, but not
> limited to, subrogation) to pursue and/or recover monies for Client that Client had,
> may have had, or has asserted against any party in connection with the Claims and
> all rights and claims against primary payers and/or third parties that may be liable
> to Client arising from or relating to the Claims, including claims under consumer
> protection statutes and laws, and all information relating thereto, all of which shall
> constitute the "Assigned Claims". The transfer, grant, right, or assignment of any
> and all of Client's right, title, ownership, interest and entitlements in and to the
> Assigned Claims shall remain the confidential and exclusive property of MSP
> Recovery or its assigns. This assignment is irrevocable and absolute. This
> assignment shall survive the termination or expiration of this Agreement,
> notwithstanding anything herein to the contrary.

Comp. Ex. NN, at 4.1. Consideration was given between each party in executing these
assignments.

On June 12, 2017, MSP Recovery, irrevocably assigned all rights acquired under the VMIL Assignment to Series 15-09-108, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the [claims](and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated April 7, 2016, by and among [VMIL]. . . and [MSP Recovery, LLC] . . .

Comp. Ex. NN. Consideration was given between each party in executing these assignments.

A42.   On April 27, 2017, **Reliance ACO, LLC,** ("RACO") irrevocably assigned all of its rights and claims to MSP Recovery Claims Series, LLC to recover against any liable entity (including defendants) for payments made on behalf of its enrollees under Medicare to MSP Recovery. Specifically, the Reliance ACO, LLC Assignment, attached as Composite Exhibit TT, states the following:

> [RACO] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [RACO's] right, title, ownership and interest in and to any reimbursement or recovery rights from responsible primary payers existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [RACO] that [RACO] had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and law, and all information relating thereto, all of which shall constitute "Assigned Claims."

Comp. Ex. TT. Consideration was given between each party in executing these assignments.

A.43.   On June 12, 2017, MSP Recovery Claims Series, LLC irrevocably assigned all rights acquired under the Reliance ACO, LLC Assignment to Series 17-02-564, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof)

as such terms are defined in the Recovery Agreement dated April 27, 2017, by and among [RACO] and [MSPRC] . . .

Comp. Ex. TT. Consideration was given between each party in executing these assignments.

A.44   On December 19, 2017, **Accountable Care Options, LLC,** ("ACOL") an ACO, irrevocably assigned all of its rights and claims to MSP Recovery, LLC to recover against any liable entity (including defendants) for payments made on behalf of its enrollees under Medicare to MSP Recovery. Specifically, the Accountable Care Options, LLC, Assignment, attached as Composite Exhibit UU, states the following:

> [ACOL] hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its successors and assigns, any and all of [ACOL's] right, title, ownership and interest in and to (i) all Claims existing on the date hereof, whether based in contract, tort or statutory right, (ii) any and all legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that [ACOL] had, may have had, or has asserted against any party in connection with the Claims and (iii) all rights and claims, legal or equitable, against primary payer, Responsible Parties and/or third parties that may be liable to client arising from or relating to the Claims, including claims under consumer protection statutes and laws.

Comp. Ex. UU. Consideration was given between each party in executing these assignments.

A45.   On March 27, 2018, MSP Recovery, LLC irrevocably assigned all rights acquired under the Accountable Care Options, LLC Assignment to Series 18-01-812, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated December 19, 2017, by and among [ACOL] and [MSPRC] . . .

Comp. Ex. UU. Consideration was given between each party in executing these assignments.

A.44   On February 26, 2016, First Medical Center, Inc., ("FMCI") irrevocably assigned all of its rights and claims to MSP Recovery, LLC to recover against any liable entity (including

defendants) for payments made on behalf of its enrollees under Medicare to MSP Recovery.

Specifically, the FMCI Assignment, attached as Composite Exhibit VV, states the following:

> [FMCI] hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of [FMCI's] right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for [FMCI] that [FMCI] has, may have had, or has asserted against any party. This includes, but is not limited to, primary payors and/or third parties that may be liable to [FMCI] arising from or relating to the Assigned Claims.

Comp. Ex. VV. Consideration was given between each party in executing these assignments.

A45.   On March June 12, 2017, MSP Recovery, LLC irrevocably assigned all rights acquired under the FMCI Assignment to Series 16-03-442, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated February 26, 2016, by and among [FMCI] and [MSPRC] . . .

Comp. Ex. VV. Consideration was given between each party in executing these assignments.

A.46   On February 2, 2016, Grupo Medico del Noreste**,** ("GMDN") irrevocably assigned all of its rights and claims to MSP Recovery, LLC to recover against any liable entity (including defendants) for payments made on behalf of its enrollees under Medicare to MSP Recovery.

Specifically, the GMDN Assignment, attached as Composite Exhibit WW, states the following:

> [GMDN] hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of [GMDN's] right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for [GMDN] that [GMDN] has, may have had, or has asserted against any party. This includes, but is not limited to, primary payors and/or third parties that may be liable to [GMDN] arising from or relating to the Assigned Claims.

Comp. Ex. WW. Consideration was given between each party in executing these assignments.

A47.   On March June 12, 2017, MSP Recovery, LLC irrevocably assigned all rights acquired under the GMDN Assignment to Series 16-02-429, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated February 2, 2016, by and among [GMDN] and [MSPRC] . . .

Comp. Ex. WW. Consideration was given between each party in executing these assignments.

A.48    On February 4, 2016, Grupo Medico del Yunque**,** ("GMDY") irrevocably assigned all of its rights and claims to MSP Recovery, LLC to recover against any liable entity (including defendants) for payments made on behalf of its enrollees under Medicare to MSP Recovery. Specifically, the GMDN Assignment, attached as Composite Exhibit XX, states the following:

> [GMDY] hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of [GMDY's] right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for [GMDY] that [GMDY] has, may have had, or has asserted against any party. This includes, but is not limited to, primary payors and/or third parties that may be liable to [GMDY] arising from or relating to the Assigned Claims.

Comp. Ex. XX. Consideration was given between each party in executing these assignments.

A49.    On March June 12, 2017, MSP Recovery, LLC irrevocably assigned all rights acquired under the GMDY Assignment to Series 16-02-428, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated February 4, 2016, by and among [GMDY] and [MSPRC] . . .

Comp. Ex. XX. Consideration was given between each party in executing these assignments.

A50.    On December 10, 2015, **Opcion MCA Inc. ("OMIC")** irrevocably assigned all its rights and claims to recover against any liable entity (including defendants) for payments made on behalf of their enrollees under Medicare Parts A, B, and D to MSP Recovery 15-624. Specifically, the OMIC Assignment attached as Composite Exhibit YY, states the following:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, in perpetuity, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information and data used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party including, but not limited to, primary payors and/or third parties that may be liable to Client arising from or relating to the Assigned Claims.

Comp. Ex. YY, at 1.1.

A51.   On June 12, 2017, MSP Recovery 15-624 irrevocably assigned all rights acquired under the OMIC Assignment to Series 15-12-401, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Health Care Claim(s) Cost Recovery Agreement dated December 10, 2015, by and among [OMIC] and [MSP Recovery, LLC] . . .

Comp. Ex. YY.

A52.   On February 26, 2016, **Quality Care Physicians, LLC ("QCPL")** irrevocably assigned all its rights and claims to recover against any liable entity (including defendants) for payments made on behalf of their enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the QCPL Assignment attached as Composite Exhibit ZZ, states the following:

> Client hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims"). This includes, but is not limited to, primary payors and/or third parties that may be liable to Client arising from or relating to the Assigned Claims.

Comp. Ex. ZZ, at 4.1.

A53.   On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under the QCPL Assignment to Series 16-03-440, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof)

as such terms are defined in the Recovery Agreement dated February 26, 2016, by and among [QCPL] and [MSP Recovery, LLC] . . .

Comp. Ex. ZZ.

A54.   On January 18, 2015, **Southern Health Care Group, Inc. ("SHGI")** irrevocably assigned all its rights and claims to recover against any liable entity (including defendants) for payments made on behalf of their enrollees under Medicare Parts A, B, and D to MSP Recovery. Specifically, the QCPL Assignment attached as Composite Exhibit AAA, states the following:

> Client hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims"). This includes, but is not limited to, primary payors and/or third parties that may be liable to Client arising from or relating to the Assigned Claims.

Comp. Ex. AAA, at 4.1.

A55.   On June 12, 2017, MSP Recovery irrevocably assigned all rights acquired under the SHGI Assignment to Series 16-01-420, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Recovery Agreement dated January 18, 2016, by and among [SHGI] and [MSP Recovery, LLC] . . .

Comp. Ex. AAA.

A56.   On April 16, 2018, ACO Health Partners, LLC ("AHPL") irrevocably assigned all of its rights and claims to recover against any liable entity (including defendants) for payments made on behalf of their enrollees under Medicare Parts A, and B to MSP Recovery, LLC. Specifically, the AHPL Assignment attached as Composite Exhibit CCC, states the following:

96

"Client irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to (i) all Claims existing on the date hereof, whether based in contract, tort or statutory right, (ii) any and all legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that Client had, may have had, or has asserted against any party in connection with the Claims and (iii) all rights and claims, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws (all of the items set forth in (i)-(iii), the "Assigned Claims")."

Comp. Ex. CCC. Consideration was given between each party in executing these assignments.

A57.    On April 20, 2018, MSP Recovery, LLC irrevocably assigned all rights acquired under the AHPL Agreement to Series 17-12-674, a designated series of Plaintiff MSPRC.

KNOW ALL MEN BY THESE PRESENTS, that each undersigned Assignor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned Claims", "Claims", Assigned Assets" and "Assigned Documents" (and all proceeds and products thereof) as such terms are defined in the **Assignment and Recovery Agreement** dated **April 16, 2018,** by and among **ACO Health Partners, LLC.**, a Delaware limited liability company, and **MSP Recovery, LLC**, a Florida limited liability company (the **"Agreement"**); irrespective of when the claims were vested in Client, inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Agreement, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto. The transfer, grant, right, or assignment of any and all of Client's right, title, ownership, interest and entitlements in and to the Agreement shall remain the confidential and exclusive property of Assignee or its assigns. The intent of the parties is to transfer any and all rights title and interest that MSP Recovery LLC obtained as an assignee from the assignor.

Comp. Ex. CCC. Consideration was given between each party in executing these assignments.

A58.    On February 26, 2016, Asociacion Medicos Selectos De La Montana Inc. ("AMSM") irrevocably assigned all of its rights and claims to recover against any liable entity (including defendants) for payments made on behalf of their enrollees under Medicare Parts A, B, and D to MSP Recovery, LLC. Specifically, the AMSM Assignment attached as Composite Exhibit DDD, states the following:

> Client hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims"). This includes but is not limited to, primary payors and/or third parties that may be liable to Client arising from or relating to the Assigned Claims.

Comp. Ex. DDD.  Consideration was given between each party in executing these assignments.

A59.   On June 12, 2017, MSP Recovery, LLC, irrevocably assigned all rights acquired under the

AMSM Agreement to Series 16-03-441, LLC a designated series of Plaintiff MSPRC.

> KNOW ALL MEN BY THESE PRESENTS, that each undersigned Assignor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned Claims", "Claims", Assigned Assets" and "Assigned Documents" (and all proceeds and products thereof) as such terms are defined in the **Recovery Agreement** dated **February 26, 2016**, by and among **Asoc. Medico Selecto de la Montana**, also known as **Asociacion Medico Selecto de la Montana, Inc.,** a Puerto Rico corporation **(the "Client")**, and **MSP Recovery, LLC.,** a Florida limited liability company **(the "Agreement")**; irrespective of when the claims were vested in Client, inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Agreement, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto. The transfer, grant, right, or assignment of any and all of Client's right, title, ownership, interest and entitlements in and to the Agreement shall remain the confidential and exclusive property of Assignee or its assigns. The intent of the parties is to transfer any and all rights title and interest that MSP Recovery LLC obtained as an assignee from the assignor.

Comp. Ex. DDD. Consideration was given between each party in executing these assignments.

A60.   On February 4, 2016, Canovanas Medical Group ("CMG") irrevocably assigned all of its

rights and claims to recover against any liable entity (including defendants) for payments made on

behalf of their enrollees under Medicare Parts A, B, and D to MSP Recovery, LLC. Specifically,

the CMG Assignment attached as Composite Exhibit EEE, states the following:

Client hereby assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, and all information used to pursue and/or recover monies for Client that Client has, may have had, or has asserted against any party ("Assigned Claims"). This includes but is not limited to, primary payors and/or third parties that may be liable to Client arising from or relating to the Assigned Claims.

Comp. Ex. EEE.  Consideration was given between each party in executing these assignments.

A61.    On June 12, 2017, MSP Recovery, LLC, irrevocably assigned all rights acquired under the AMSM Agreement to Series 16-02-427, LLC a designated series of Plaintiff MSPRC.

KNOW ALL MEN BY THESE PRESENTS, that each undersigned Assignor, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Assigned Claims", "Claims", Assigned Assets" and "Assigned Documents" (and all proceeds and products thereof) as such terms are defined in the **Recovery Agreement** dated **February 4, 2016**, by and among **Canovanas Medical Group**, also known as **Canovanas Medical Group, Inc.,** a Puerto Rico corporation **(the "Client"),** and **MSP Recovery, LLC,** a Florida limited liability company **(the "Agreement");** irrespective of when the claims were vested in Client, inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Agreement, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto. The transfer, grant, right, or assignment of any and all of Client's right, title, ownership, interest and entitlements in and to the Agreement shall remain the confidential and exclusive property of Assignee or its assigns. The intent of the parties is to transfer any and all rights title and interest that MSP Recovery LLC obtained as an assignee from the assignor.

Comp. Ex. EEE. Consideration was given between each party in executing these assignments.

A62.    On December 10, 2015, **Millennium Medical Health Group, Inc. ("MMED")** irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants for payments made on behalf of its Enrollees under Medicare Parts A, B, and D to MSP Recovery 15-621, LLC. Specifically, the MMED Assignment, attached as Composite Exhibit FFF, states the following:

Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, or its assigns, in perpetuity, any and all Client's right, title, ownership

> and interest to and to all rights and entitlements, and all information and data used
> to purse and/or recover monies for Client that Client has, may have had, or has
> asserted against any party, including, but not limited to, primary payors and/or third
> parties that may be liable to Client arising from or relating to the Assigned Claims.

Comp. Ex. FFF, at 1.1. Consideration was given between each party in executing these
assignments.

A63.    On June 12, 2017, MSP Recovery 15-621, LLC, irrevocably assigned all rights acquired

under the MMED and Assignment to Series 15-12-398, LLC, a designated series of Plaintiff

MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to
> Assignee and its successors and assigns, any and all of Assignor's rights, title,
> ownership and interest in and to the [claims] (and all proceeds and products thereof)
> as such terms are defined in the Health Care Claim(s) Cost Recovery Agreement
> dated December 10, 2015, by and among [Millennium Medical] and [MSP
> Recovery 15-621, LLCLC] . . .

Comp. Ex. FFF.  Consideration was given between each party in executing these assignments.

A64. On October 8, 2015, **Healthcare Alliance Inc. ("HAI")** irrevocably assigned all its rights

and claims to recovery against any liable entity (including defendants for payments made on behalf

of its Enrollees under Medicare Parts A, B, and D to MSP Recovery 15-475, LLC. Specifically,

the **Healthcare Alliance Inc.** Assignment, attached as Composite Exhibit GGG, states the

following:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP
> Recovery, or its assigns, in perpetuity, any and all Client's right, title, ownership
> and interest to and to all rights and entitlements, and all information and data used
> to purse and/or recover monies for Client that Client has, may have had, or has
> asserted against any party, including, but not limited to, primary payors and/or third
> parties that may be liable to Client arising from or relating to the Assigned Claims.

Comp. Ex. GGG.

A65.   On June 12, 2017, MSP Recovery 15-475, LLC, irrevocably assigned all rights acquired under the Millennium Medical and MSP Recovery 15-475, LLC Assignment to Series 15-09-273, LLC, a designated series of Plaintiff MSPRC:

> [Assignor] irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's rights, title, ownership and interest in and to the [claims] (and all proceeds and products thereof) as such terms are defined in the Health Care Claim(s) Cost Recovery Agreement dated October 8, 2015, by and among [Millennium Medical] and [MSP Recovery 15-475, LLCLC] . . .

Comp. Ex. GGG. Consideration was given between each party in executing these assignments.

**Plaintiff MSPA's Standing**

A66.   On April 15, 2014, **Florida Health Care Plus, Inc.,** ("FHCP") irrevocably assigned all of its rights and claims to recover against any liable entity (including defendants) for payments made on behalf of their enrollees under Medicare Parts A, B, and D to La Ley Recovery Systems, Inc. ("La Ley Recovery"). Specifically, the FHCP Assignment, attached as Composite Exhibit OO, states the following:

> [b]y way of this agreement, [FHCP] appoints, directs, and otherwise ***assigns*** all of [FHCP's] rights as it pertains to the rights pursuant to any plan, State or Federal statute whatsoever directly and/or indirectly for any its members and/or plan participants.

Comp. Ex. OO, at 1.1. Consideration was given between each party in executing these assignments.

On February 20, 2015, La Ley Recovery irrevocably assigned all rights acquired under the FHCP Assignment to MSPA:

> [La Ley Recovery] hereby irrevocably assigns, transfers, conveys, sets over, and delivers to [MSPA] or its assigns any and all of [La Ley Recovery]'s rights, title, ownership and interest in and to all rights and entitlements, that [La Ley Recovery] has, may have had, or has asserted against third parties arising from or relating to the Claims.

Comp. Ex. OO. Consideration was given between each party in executing these assignments.

On June 1, 2016, La Ley Recovery, MSP Recovery, LLC, MSPA, and the Florida Department of Financial Services as the Receiver of FHCP entered into a Settlement Agreement. That Settlement Agreement confirmed the transfer of recovery rights from FHCP to MSPA. Leon County Court of Florida approved this Settlement Agreement on June 14, 2016. Comp. Ex. HH. Consideration was given between each party in executing these assignments.

A67.   On December 16, 2014, **Interamerican Medical Center Group, LLC** ("IMC") irrevocably assigned all of its rights and claims to recover against any liable entity (including defendants) for payments made on behalf of their enrollees under Medicare Parts A, B, and D to MSP Recovery, LLC ("MSP Recovery"). Specifically, the IMC Assignment, attached as Composite Exhibit QQ, states the following:

> By way of this Agreement, [IMC] appoints, directs, or otherwise, irrevocably assigns all of [IMC's] rights as it pertains to the rights pursuant to any plan, State or Federal statute(s) whatsoever directly and/or indirectly for any of its members and/or plan participants, and/or its rights . . .

Comp. Ex. QQ. Consideration was given between each party in executing these assignments.

On February 20, 2015, MSP Recovery irrevocably assigned all rights acquired under the IMC Agreement to MSPA:

> Assignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee or its assigns any and all of Assignor's right, title, ownership and interest in and to all rights and entitlements, that Assignor has, may have had, or has asserted against third parties from or relating to the Claims.

Comp. Ex. QQ.

Case 1:13-md-02428-DPW   Document 2014   Filed 03/12/19   Page 103 of 104


IMC consented to, acknowledged, approved, and ratified the assignment from MSP Recovery to MSPA. Comp. Ex. II. Consideration was given between each party in executing these assignments.

A68.   On June 2, 2015, **Texas Physicians ACO ("TPA")** irrevocably assigned all its rights and claims to recover against any liable entity (including defendants) for payments made on behalf of their enrollees under Medicare to MSPA Claims, X, LLC. Specifically, the APCM Assignment, attached as Composite Exhibit BBB, states the following:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Claims, or its assigns, any and all of Client's right, title, ownership and interest in and to all rights and entitlements, that Client has, may have had, or has asserted against any party including primary payors and/or third parties that may be liable to Client arising from or relating to the Claims related to services and/or supplies

Comp. Ex. BBB, at 1.1.

**Plaintiff MAO-MSO's Standing**

A69.   On May 3, 2016, **Preferred Medical Plan, Inc.** ("PMPI") irrevocably assigned all of its rights and claims to recover against any liable entity (including defendants) for payments made on behalf of their enrollees under Medicare Parts A, B, and D to La Ley Recovery. Specifically, the PMPI Assignment, attached as Composite Exhibit SS, states the following:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory, right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payors and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims," as also specified in Section 1.1.

Comp. Ex. SS, at 3.1. Consideration was given between each party in executing these assignments.

On August 8, 2016, MAO-MSO irrevocably assigned all rights acquired under the

PMPI Agreement to MSP Recovery:

> Assignor hereby irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, all of Assignor's right, title, ownership and interest in and to all Assigned Claims, plus all proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party in connection with the Assigned Claims, and all rights and claims against primary payers and/or third parties that may be liable to Assignor arising from or relating to the Assigned Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims."

Comp. Ex. SS, at 1.1. Consideration was given between each party in executing these assignments.